Lionel **BRADFORD**, Petitioner,

v.

Perry **JOHNSON**, Warden, Respondent.

Civ. A. No. 37176.

United States District Court,
E. D. Michigan, S. D.

July 14, 1972.

**1332**

David R. Hood, Clinical Advocacy Program, Detroit, Mich., for petitioner.

Frank J. Kelley, Atty. Gen., by J. Ronald Kaplansky, Asst. Atty. Gen., Crim. Div., Office of Atty. Gen., Lansing, Mich., for respondent.

## OPINION AND ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

KENNEDY, District Judge.

Petitioner, Lionel Bradford, is presently incarcerated in the State Prison for Southern Michigan, serving a sentence of 20 to 40 years for assault with intent to commit murder imposed by the Circuit Court for Berrien County, Michigan, on February 6, 1963, following conviction by jury trial.

Prior to seeking a writ of habeas corpus with this Court pursuant to Section 2241, Title 28, United States Code, petitioner had exhausted his State remedies as required by Section 2254, Title 28, United States Code, including application for leave to appeal to the Michigan Supreme Court, which was denied October 1, 1968 (Justice Thomas M. Kavanaugh dissenting). He also sought direct appeal from the Michigan Supreme Court to the Supreme Court of the United States. His application for certiorari was denied. *See* Bradford v. Michigan, 394 U.S. 1022, 89 S.Ct. 1638, 23 L.Ed.2d 48 (1968), three justices dissenting.

Petitioner's conviction and sentence are alleged to be in violation of the Fourteenth Amendment because he was deprived of due process of law both before and during his trial.

The basic facts as alleged by petitioner are admitted to be true by the State of Michigan and, indeed, were fully admitted to at the time of petitioner's trial and appeals in the State courts.

On November 5, 1962, two Benton Harbor, Michigan, police officers were shot and seriously wounded as they attempted to investigate a robbery. The day after the shooting the Benton Harbor police arrested one LeRoy Payne who was questioned for approximately 24 hours during which he was denied food, water and sleep, was physically abused and beaten about the face, sides and genitals, was threatened and degraded by racial epithets, and was threatened with the possible arrest of his wife and removal of his children

from his home. He was promised an end to this treatment upon his confessing to the crime and naming his accomplice. A portion of this mistreatment was inflicted at the Benton Harbor police station by Benton Harbor police and continued at the Berrien County sheriff's office by Berrien County sheriff's officers. During this period he was arraigned by a municipal judge who was aware of the mistreatment, since Payne's face was cut and bruised, but did nothing to stop it. Prior to his arraignment, Payne was also visited by an assistant county prosecutor, a Mr. Lake, who told Payne he'd better tell the truth and that if he tried to fight this, he (Lake) would arrest and prosecute his wife and take his children away from their home. LeRoy Payne finally confessed and implicated petitioner, Lionel Bradford.

Despite the fact that Payne confessed, his beatings were not over; he suffered constant fear and punishment for at least another two or three days.

After Payne confessed, he was placed in a cell, where almost immediately he fell asleep, losing track of time. Shortly, or at length, he was abruptly awakened and removed from the cell by some State troopers who took him to the interrogation room. They tried to convince Payne that they were not working on the case, but were just curious about the crime. They asked him to tell what happened. Payne, not understanding what they wanted from him, insisted he had told all there was to tell and had nothing more to say. At this point, he was thrown against a table and held there while another trooper began squeezing his testicles until Payne recounted his story told earlier to the sheriff. When Payne completed his story, one trooper left the interrogation room. Another remained with Payne, telling him that he did not want to hurt him; he just wanted to know everything that had happened. While the trooper was talking, Payne could hear a tape recording of his confession to the troop-

ers being played back. Afterward, he was returned to his cell.

On Wednesday or Thursday, Payne was taken down to the sheriff's department to see Lionel Bradford. His conversation with Bradford (which was electronically overheard) contained essentially a request by Bradford that Payne name someone else so Bradford could go home. To this request, Payne answered that he had taken all the physical punishment he could stand; but upon reconsideration, Payne agreed to mention the name "John Perkins" as being his accomplice. Payne was returned to his cell in the county jail. The next day, Detective Smith and another detective came to question Payne. They told Payne that he was going to tell the truth and that they didn't want any lies. Payne reassured them he had told the truth but they did not believe him. One detective grabbed him and held him down while the other grabbed his testicles and began to squeeze. The detectives mentioned the name "Perkins" and wanted to know why Payne had suggested it to Bradford. Payne told them that the only reason he had mentioned it was because Bradford kept begging Payne to call another name. After this clarification, Payne was returned to his cell. This incident was the last claimed abuse, which the State admits, although it admits he continued to remain until trial, and indeed throughout trial and for a period subsequent thereto, in the custody of the sheriff's department. Payne now claims that during the trial he was purposefully given opportunities to escape so that he could be shot.

At petitioner's trial, which began on February 4, 1963, the principal witness against him was LeRoy Payne, who had pled guilty to the same charge and was awaiting sentence. LeRoy Payne was at that time under the custody and control of the same Berrien County law enforcement officials who had tortured and abused him and to whom he was to be returned immediately after his testifying in petitioner's trial. Petitioner objected to Payne's testimony on the

grounds that it was the result of coercion and torture and was therefore unreliable and incompetent. The testimony was allowed over petitioner's objection. Petitioner was subsequently found guilty by the jury and sentenced on February 6, 1963. (Payne was not sentenced until March 8, 1963).

After his transfer from the Berrien County jail, and while incarcerated in the Ionia State Reformatory, LeRoy Payne recanted, signing an affidavit on August 31, 1965, to the effect that his testimony at petitioner's trial was untrue and was given only because of fear for his personal safety and that of his family.

LeRoy Payne filed a Motion for New Trial claiming his guilty plea was coerced. This was denied. He appealed, and the Michigan Court of Appeals remanded to the Berrien Circuit Court ordering it to hold an evidentiary hearing to discover whether Payne's confession was coerced. On June 5, 1967, Judge Burns (having replaced Judge Hadsell who had presided at Bradford's trial, as well as accepted Payne's plea) suppressed LeRoy Payne's confessions, admissions and statements made to the police from November 5, 1963 to December 14, 1963, upon a finding by the court that all such statements were the result of coercion and were not made voluntarily. It is also noted that a pretrial motion was made at Payne's second trial which requested that all statements Payne made against interest at Bradford's trial also be suppressed. This motion was granted, though the reasons for which it was granted are not known to this Court. Payne was then granted a new trial. Subsequently, a motion to change venue was also granted.

Petitioner argues that the use of Payne's testimony under the above circumstances is a denial of due process under the Fourteenth Amendment. It is conceded by the State that Payne's testimony was crucial to petitioner's conviction. In denying petitioner's delayed motion for new trial the State trial judge stated:

I would say if they didn't have Payne's testimony they would probably not have convicted him [petitioner Bradford] . . . I don't think there is any doubt about that.

Respondent, the State of Michigan, argues that no due process issue is raised but rather one of the credibility of the in-court testimony of Payne, a fact which the jurors were competent to judge.

The Constitutional challenge to the use of Payne's testimony under the circumstances here is two-fold. First, it is asserted that since due process does not permit a person to be convicted upon his own coerced confession it should not allow him to be convicted upon a confession wrung from another by coercion. This is the proposition stated by Justice Rutledge in his dissenting opinion in Malinski v. New York, 324 U.S. 401, 431, 65 S.Ct. 781, 796, 89 L.Ed. 1029 (1945) when he concluded:

The effect is not different because . . . the torture is applied to other witnesses but not to the accused.

The majority of the Court in that case did not reach the issue involved here since they found, as a matter of fact, that the coerced confession of the one defendant had not been used against the other defendant.

This issue has never been squarely presented to the Supreme Court for consideration and there is no controlling Sixth Circuit case on point. This Court is faced, then, not with an altogether novel issue, but one in which there is no authoritative case to aid in resolution of the basic question, i. e., whether the due process clause offers protection to defendants incriminated by a witness who was tortured to gain the incriminating statements similar to that provided by the Fifth Amendment and the due process clause to defendants who are themselves tortured into self-incrimination.

■■ Due process is clearly invoked where coercion is used against a defendant in order to elicit self-incrimination. See Brown v. Mississippi, 297 U.S. 278,

56 S.Ct. 461, 80 L.Ed. 682 (1936); Chambers v. Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940); Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941). Truth or falsity of the incriminating statements is irrelevant in that situation to the application of due process. The sole issue is the fundamental unfairness in the prosecution of one presumed to be innocent. Due process is also invoked where by active conduct or connivance of the prosecution a conviction is obtained through the use of perjured testimony. See Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). In addition, the Supreme Court has recognized that due process would be invoked where responsible officials of the State knowingly used false testimony which was extorted from a witness by violence and torture to convict a defendant. See Hysler v. Florida, 315 U.S. 411, 62 S.Ct. 688, 86 L.Ed. 932 (1942). The facts alleged in *Hysler* as the basis of petitioner's claim for relief on a writ of habeas corpus were that a witness had been tortured in order that incriminating statements could be gained regarding the defendant who had not himself been tortured; and that, later, the witness recanted his testimony. Since there was a finding that no coercion or torture was in fact used on the witness against Hysler, this case is of no further help except for the recognition that such a factual allegation does invoke Federal jurisdiction and, potentially, the application of due process.

Further, in *Hysler*, the Supreme Court was concerned with the fact that neither the court nor the prosecutor had knowledge of the alleged abuse. In the instant case, that problem is non-existent as the arraigning magistrate, the trial judge, and the county prosecutor all had knowledge of the beatings. These responsible officials of the State not only knew of the abuse, but failed to take steps to protect Payne from further abuse or the coercion so inherently present at the time Payne testified. There was, in fact, a photograph contained in the court file showing how badly Payne was abused; the trial judge refused to accept it into evidence on the ground it was too inflammatory.

Insofar as Payne was concerned neither his out-of-court nor in-court incrimination could be used against him.

■ LeRoy Payne's constitutional ground for suppression of his coerced confession rests on his Fifth Amendment right to be free from self-incrimination and on due process of law. Of course, petitioner has no standing to raise Payne's right to be free from self-incrimination and he has no constitutional right to be free from incrimination by another. However, where that incrimination is the result of torture the Court ought to scrutinize the method of incrimination to insure the defendant that there was fairness in his prosecution.

Petitioner presents a line of cases which recognized the inherent untrustworthiness of coerced confessions at common law prior to those cases which would exclude coerced confessions on other grounds, such as official misconduct. See Hopt v. Utah, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884); Brown v. Mississippi, *supra*; Chambers v. Florida, *supra*; Lisenba v. California, *supra*. That line of cases recognized that the implication of guilt through torture creates untrustworthy confessions as a matter of law, and beginning with *Brown* that it also violates due process. Such confessions are excluded from the jury to weigh and judge.[1]

---

[1] . . . Petitioner has referred in his brief to the Federal rule of evidence which excludes the testimony and confessions of co-defendants when they are obtained illegally; and which exclude such statements not only in behalf of the defendants who gave them, but also in behalf of other defendants who are implicated by them. See McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and its companion case, Anderson v. United States, 318 U.S.

It is pointed out by respondent that petitioner was not convicted upon the incriminating statements secured by torture of Payne but, rather, by Payne's in-court testimony. Petitioner responds that Payne's in-court testimony and out-of-court tortured confessions were so closely intertwined as to be inseparable, where those out-of-court confessions had not been suppressed.

A decision on the above issue is not required in view of the second challenge to the use of Payne's testimony. That is, that such a degree of coercion existed at the time he testified that a conviction which rests on his testimony violates due process.

Our American system of criminal law is predicated upon a presumption of innocence which cannot be rebutted except by competent proof beyond a reasonable doubt that the defendant is guilty and that such rebuttal comports with a concept of fairness and civility, namely, due process of law.

■ ■ Testimony of Payne given at petitioner's trial was untrustworthy under due process standards. As recited above, he was physically tortured before arraignment. He appeared at arraignment visibly beaten and was returned by the magistrate to the custody of his torturers. He was tortured until he confessed *and* incriminated petitioner. He was promised cessation of his torture only after he incriminated another, in addition to himself. When he recanted his incrimination of petitioner he was tortured again until he returned to the incrimination of petitioner. This abuse came from persons in each strata of law enforcement to which Payne could turn for protection—the city police, the county sheriff, the state police. In addition, he was threatened by an assistant prosecutor. This was done with the knowledge of a judicial officer, the magistrate. The in-court testimony of a witness obtained by these means when he must surrender himself immediately after testifying to those persons who tortured him, does not comport with due process. Payne's statement in court that his in-court testimony was not coerced is, under the above circumstances, worthless since it is affected by the same coercion. There are some additional factors which buttress the conclusion of coercion: Payne knew that the State police had a recording of his confession and implication of petitioner. They had beaten him to get it. Further, although he had been told by the prosecutor who was trying the case that he could file a complaint against the police officers who had abused him, he did not do so. A strong inference of fear and control of Payne can be drawn from this fact for it is difficult to believe that a

350, 63 S.Ct. 599, 87 L.Ed. 829 (1943). While petitioner does not rely on this rule or argue that it is applicable to the States through the Fourteenth Amendment, the Court will briefly distinguish these cases from petitioner's, in order to make it clear that the present case is not disposed of by the arguments raised there. The Supreme Court recognized in *McNabb* the supervisory powers of states to establish their own rules of procedure and evidence, and, likewise, its own power with respect to Federal courts. The two are distinct: the Federal courts have no occasion to review State procedures and rules of evidence except where "fundamental principles of liberty and justice" are at issue. In *McNabb*, there were many distinctions from the present case, but most relevant were: (1) the lack of coercion or force to obtain the statements; and (2) the fact that a Federal statute had been violated by Federal officers which allowed the Supreme Court to rule on the admissibility of the evidence without reaching the Constitutional issue of due process. The statute required an arresting officer to take defendants before a commissioner or other judicial officer for arraignment and setting of bond before any interrogation could occur. In *McNabb* and *Anderson*, the arresting officers interrogated and obtained incriminating statements prior to taking defendants before a commissioner or other judicial officer for arraignment and bond. Pursuant to the Court's supervisory powers, the convictions which were obtained by the use of such evidence were reversed.

The contentions of petitioner here are obviously outside the purview of these cases as the coercion involved does raise a question with regard to "fundamental principles of liberty and justice".

man who had been so abused would not seek redress. Under normal circumstances, the issue of credibility is one which the jury can weigh as a question of fact. But where the violence so vitiates the relative value of the testimony, it ought not to be weighed by a jury in the ordinary course of a trial. Such testimony ought to be ruled upon first, not only with regard to its untrustworthiness, but also with regard to its competency, by due process standards. This does not mean that incriminations of others coerced by torture necessarily poison all future in-court testimony.

■ Trial judges have the power and ability to offer protection to witnesses and defendants who are abused by their jailers. Surely, it is the court's duty, then, to secure not only their safety but also their testimony by keeping such witnesses and defendants free from violence and influence during and after their testifying. In the instant case, perhaps a change of venue or custody in another institution would have resolved this problem, securing both Payne's physical safety and petitioner's right to have untortured witnesses against him. No such safeguard was afforded.

As the Supreme Court stated in Lisenba v. California, *supra*, 314 U.S. at page 236, 62 S.Ct. at page 290:

The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false.

The majority found in *Lisenba* that the defendant, though his interrogation had been lengthy, had not received any threats, promises or acts of physical violence and, therefore, affirmed the introduction of statements made by him against interest. However, before finding the facts to be so, the Court discussed at length the issue of due process of law with regard to coerced testimony. In so doing, the Court distinguished the various State and Federal procedures used to exclude presumptively false evidence which are not compelled by the Fourteenth Amendment to prevent fundamental unfairness. At pages 236–237, 62 S.Ct. at pages 289–290, the Court explains:

The aim of the rule that a confession is inadmissible unless it was voluntarily made is to exclude false evidence. Tests are invoked to determine whether the inducement to speak was such that there is a fair risk the confession is false. These vary in the several states. This Court has formulated those which are to govern in trials in the federal courts. The Fourteenth Amendment leaves California free to adopt, . . . and to enforce such rule as she elects, whether it conform to that applied in the federal or in other state courts. But the adoption of the rule of her choice cannot foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law.

■ Respondent urges that the Michigan Court of Appeals,[2] in affirming the trial court's admission into evidence of Payne's testimony, applied that standard, considered the weight to be given to Payne's testimony and determined it to be reliable; further, that that court considered whether to expand the rule as stated in People v. Hamilton, 359 Mich. 410, 102 N.W.2d 738 (1960), that coerced confessions are inadmissible against defendants who are convicted upon testimony of witnesses initially coerced, but chose not to do so. Those rules by which Michigan weighs the credibility of evidence are not here at issue and, indeed, do not invoke Federal jurisdiction. Still, they do not foreclose this Court's jurisdiction to inquire as to whether petitioner's trial lacked fundamental fairness required under the Fourteenth Amendment. The guidelines are set out in *Lisenba, supra,* 314 U.S. at pages 236–237, 62 S.Ct. at page 290:

As applied to a criminal trial, denial of due process is the failure to ob-

2. People v. Bradford, 10 Mich.App. 696, 160 N.W.2d 373 (1968).

serve that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevent a fair trial. Such unfairness exists when a coerced confession is used as a means of obtaining a verdict of guilt.

Under those guidelines' petitioner was denied the right to a fair trial guaranteed him by the Fourteenth Amendment.

The use of Payne's testimony is analogous to the knowing use of perjured testimony or testimony purchased by a litigant. Justice Kavanagh recognized this in his dissent to Bradford's denial of leave to appeal to the Michigan Supreme Court, People v. Bradford, 381 Mich. 778 (1968), when he said:

It is a strange double standard to judicially condemn purchased testimony yet to judicially condone testimony procured under threats to the physical safety of the witness. [Citing: Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).]

No court would knowingly allow the police or prosecutor to call a person to testify who had no knowledge of the case and encourage him to conjure testimony simply because the State needed a witness. In effect, that is what happened here. Through the use of medieval torture techniques Payne was asked to be the star witness with a reward of cessation of pain and fear upon giving the proper testimony. The real threat of further abuse was not removed. Under these circumstances, the use of knowingly coerced incrimination of another is so patently untrustworthy that it rivals the knowing use of perjured testimony. The petitioner ought, at least, under a system of rebuttable presumption of innocence, to be given the safeguard of uncoerced, untortured incrimination by another.

For the reasons stated herein the motion to dismiss the petition for writ of habeas corpus is denied and the petition for writ of habeas corpus is granted.

It is hereby ordered that the Judgment of Conviction and Sentence imposed upon petitioner Lionel Bradford by the Circuit Court for Berrien County, Michigan, on February 6, 1963, be vacated.

It is further ordered that unless proper authorities of Berrien County, Michigan, commence a new trial of petitioner within reasonable time, not to exceed ninety (90) days from the date of this Order, petitioner Lionel Bradford shall be discharged forthwith; appropriate bail shall be set not less than thirty (30) days from this date.