218

520 A.2d 1101

**Kelly Lee PINDER**

v.

**STATE of Maryland.**

**No. 660, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Feb. 6, 1987.
Certiorari Denied June 18, 1987.

Ilene Cohen, Assigned Public Defender of Annapolis (Alan H. Murrell, Public Defender on the brief of Baltimore), for appellant.

Ann E. Singleton, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Baltimore, and J. Frederick Price, State's Atty. for Kent County on the brief of Chestertown, for appellee.

Argued before WILNER, WEANT and BISHOP, JJ.

WEANT, Judge.

A Kent County jury has found Kelly Lee Pinder (appellant) guilty of battery. On appeal, Pinder claims five instances of trial court error, namely:

I. The court below erred by denying a mistrial based on a prospective juror's statement that she had seen Appellant in jail.

II. The court below erred by admitting medical records without a proper foundation.

III. The court below erred by denying motions to suppress improperly obtained statements of a witness.

IV. The court below erred by excluding testimony of police misconduct.

V. The court below erred by denying a mistrial after the jury heard inflammatory, prejudicial testimony.

For the reasons set out below, we shall affirm the judgment against appellant.

## I.

During voir dire a prospective juror, who was employed by the Sheriff's Department as a correctional officer, disclosed that Pinder "has been in the jail before." That remark prompted appellant to move for a mistrial. The court denied the motion and instead instructed the prospective jurors that

> the fact that someone is in the jail, of course, has no bearing whatsoever on the fact of whether that person is guilty or not guilty of an offense with which he is charged. And therefore you should draw no conclusion as to the guilt or innocence of the Defendant, Mr. Pinder. So just disregard that, because you will hear me later also explain a couple of other things that the law provides for all of us.

■ Unlike appellant, we do not perceive the court's failure to grant a mistrial as an abuse of discretion. In our view, the court acted promptly and forcefully to remove the possibility of injury to Pinder. *See Myers v. State,* 58 Md.App. 211, 228, 472 A.2d 1027, 1036, *cert. denied,* 300 Md. 484, 479 A.2d 373 (1984). Moreover, after juror selection was completed, both appellant and his counsel noted, without qualification, that the jury as constituted was satisfactory; consequently, appellant withdrew or abandoned his prior objection that prospective jurors had been prejudiced by the correctional officer's remark. *See Foster v. State,* 304 Md. 439, 447–53, 499 A.2d 1236, 1240–43 (1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986).

## II.

Blackiston, the victim, went to Kent and Queen Anne's Hospital for treatment of the injuries he allegedly sustained at the hands of appellant. Dr. James G. McGettigan attended to Blackiston's injuries and so testified at trial. He also

produced the medical report that is the subject of appellant's second claim of error.

Although appellant concedes that hospital records kept in the ordinary course of business are admissible under the business records exception of the hearsay rule, he challenges the court's decision to admit those sections of the medical report not authored by Dr. McGettigan, claiming lack of proper foundation.

■ Our review of the medical report in question, as well as the trial court's questions to Dr. McGettigan regarding the report, persuades us that the trial court properly admitted it into evidence. *See Watkins v. State,* 42 Md.App. 349, 355–56, 400 A.2d 464, 468 (1979). In any event, we fail to perceive how admission of the report harmed appellant. (His objections to introduction, both at trial and here, do not address this issue.) Because the medical report merely describes Blackiston's injuries and the treatment he received, and because Dr. McGettigan and Blackiston had already testified about these matters, there is no evidence that appellant was prejudiced by the court's decision to admit the report.

### III.

After the jury was sworn, the trial judge held a hearing to determine whether statements made by Shelly Blanchfield, appellant's sister, to Officer Thomas Groce of the Chestertown Police Department and to Deputy State's Attorney Susanne Schmoldt should be suppressed. Ms. Blanchfield and Ms. Schmoldt testified at the hearing; stated briefly, their testimony revealed the following facts.

Somehow, Officer Groce learned that Ms. Blanchfield had information concerning the Blackiston incident. Groce went to Blanchfield's place of employment and from there took Blanchfield to the police station. At the station, Groce told Blanchfield that she would be arrested as an accessory after the fact in connection with the Blackiston beating if she did not give a statement. Blanchfield, without being

advised of any constitutional rights she might have, then executed a written statement that incriminated her brother and Vernon Walters. At Groce's urging, Blanchfield also wrote that she had approached Groce about giving a statement. Groce himself added a clause to the effect that everything contained in Blanchfield's written statement was the sworn truth; this clause was penned after Blanchfield signed her statement.

Later, Deputy State's Attorney Schmoldt met with Blanchfield to review Blanchfield's statement to Groce. The interview between Blanchfield and Schmoldt was taped with Blanchfield's knowledge. Schmoldt did not advise Blanchfield of any constitutional rights because she did not consider Blanchfield to be a suspect. Schmoldt admitted, however, that, when Blanchfield pressed the issue, Schmoldt told her that the situation sounded like a case of accessory after the fact. As the interview progressed, Schmoldt learned of Groce's misconduct; Blanchfield again incriminated her brother and Vernon Walters.

Ms. Blanchfield was represented by counsel at the suppression hearing. He argued that Blanchfield's statement to Groce should be suppressed because it was the product of coercion and intimidation and was given without Blanchfield being advised of or waiving her constitutional rights. The statement to Schmoldt, he contended, was fruit of the poisonous tree. Counsel also stated that, if called to testify, Blanchfield would invoke her fifth amendment right against compelled self-incrimination.

Pinder's attorney also argued for suppression. He too complained about the means by which the statements were obtained. He argued that both Groce and Schmoldt threatened Blanchfield with prosecution. He also focused on the perjury contained in the statement to Groce, contending that the perjury rendered the statement "completely unreliable...." When the court immediately responded that "[t]hat's up to the jury to decide, if the witness testifies," defense counsel said: "I totally agree with you as to that

aspect of it." Later, but before its final ruling on the motion to suppress, the court again indicated that it would allow the statements to be used for impeachment purposes if Ms. Blanchfield testified; Pinder's counsel responded as follows:

> I won't dispute that, and of course to indicate the correctness of the statement or the reliability of the statement and of everything that took place is going to be a question for the jury. The significant point is that she was threatened with imprisonment unless she did something, and not only was that wrong—

The court ultimately denied Ms. Blanchfield's motion to suppress, saying that the statements could be used for the limited purpose of impeachment if Ms. Blanchfield testified at trial. The court also ruled that if Ms. Blanchfield asserted her fifth amendment privilege against self-incrimination, it, having found that Blanchfield is not in danger of being prosecuted, would instruct her to testify.

On appeal, Pinder "concedes that he has no right to raise and litigate Ms. Blanchfield's 5th Amendment privilege *per se* on appeal." He then argues that "the involuntary nature of both statements [*i.e.*, those made to Groce and Schmoldt,] creates error even apart from any 5th Amendment procedural mandate," and that, "[w]ith relation to Appellant, if for no other reason, the statements should have been suppressed because of their unreliability." He concludes by claiming, albeit without citing any authority, that "[t]he suppression of Ms. Blanchfield's statements at the outset of the trial was necessary to insure a fair trial, and the court below erred by denying suppression."

It is far from pellucid that Pinder's appellate contentions are properly before us. During trial there were a number of lengthy discussions regarding Blanchfield's statements to Groce and Schmoldt. Appellant initially tried in limine to prohibit Blanchfield from being asked any questions concerning statements in which Blanchfield related what may have been said to her by Vernon Walters. Later, defense

counsel suggested that the State and the defense stipulate to certain portions of Blanchfield's prior statements and have the court read them to the jury. When counsel finally reached agreement on a stipulation, appellant noted a number of reasons why the stipulated portions of Blanchfield's statements should not be admitted; several of these objections were retracted after further discussion between defense counsel and the trial judge. Later, when the court finally read the stipulation to the jury, no objection was forthcoming.

Whether appellant's various objections at trial constituted a retraction of his earlier concessions that reliability was an issue for the jury is doubtful. Whether appellant ever clearly articulated that use of Blanchfield's out-of-court statements would result in an unfair trial is also unclear. Because, however, the admissibility *vel non* of the statements was an issue the trial court considered time and time again, we shall assume arguendo that appellant's instant complaints have been preserved for our review. We also shall assume that appellant's concluding remark in his appellate brief concerning the unfairness engendered by the trial court's failure to suppress Blanchfield's statements is intended as a claim that he was denied due process.

A number of courts have considered the issue of whether a defendant's due process rights were violated when a witness's involuntary statement was admitted into evidence. *E.g., United States v. Merkt,* 764 F.2d 266 (5th Cir.1985) (Recognizing that admission at trial of a witness's coerced out-of-court statement may violate a defendant's right to a fair trial as guaranteed by the due process clause of the fifth amendment, the court nevertheless found that, even if law enforcement agents had improperly intimidated and coerced witnesses, the conduct was improper but not so egregious as to require exclusion of the witnesses' statements as a prophylactic measure); *United States v. Chiavola,* 744 F.2d 1271 (7th Cir.1984) (Recognizing that due process is implicated when the government seeks a conviction through the use of evidence obtained by extreme coer-

cion or torture, the court found that defendant's trial was not fundamentally unfair, since all defendant could claim was that he made incriminating statements during a telephone conversation that had been involuntarily initiated by another); *United States v. Fredericks*, 586 F.2d 470 (5th Cir.1978), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979) (Defendant's right to a fair trial was not prejudiced by introduction of witness's statement since the reliability of that statement was not suspect and since the actions of the DEA officers were a far cry from the sort of third-degree physical or psychological coercion that might prompt the court to disregard the societal interest of law enforcement by excluding probative testimony); *LaFrance v. Bohlinger*, 499 F.2d 29 (1st Cir.), *cert. denied*, 419 U.S. 1080, 95 S.Ct. 669, 42 L.Ed.2d 674 (1974) (Where witness at trial had recanted statements in earlier confession saying that the confession was the product of coercion, the court held that a hearing to determine the voluntariness of the confession was required); *Bradford v. Johnson*, 354 F.Supp. 1331 (E.D.Mich.1972), *aff'd*, 476 F.2d 66 (7th Cir. 1973) (per curiam) (Recognizing that under normal circumstances the issue of credibility is one which the jury can weigh as a matter of fact, the court found that the testimony of witness given at trial of defendant should not have been admitted because it was a product of torture and thus untrustworthy under due process standards); *State v. Montgomery*, 219 N.C. 235, 229 S.E.2d 904 (1976) (Where jury was fully informed of alleged coercive action by police and where each witness steadfastly asserted the truth of the material facts obtained through the alleged coercion, defendant was not deprived of his constitutional right to due process by introduction of witnesses' allegedly coerced statements).

Maryland state courts, in turn, appear only tangentially to have touched upon this same issue. This Court has recently posited that "the Fifth Amendment privilege against self-incrimination is a personal one which may only be invoked by the witness and his counsel. ... Even if a

witness makes a claim of privilege and is improperly disallowed by the trial court, it is not reversible error on behalf of the defendant." *Rowe v. State,* 62 Md.App. 486, 499, 490 A.2d 278, 284, *cert. denied,* 303 Md. 684, 496 A.2d 683 (1985) (citations omitted). Furthermore, in *Veney v. State,* 251 Md. 159, 246 A.2d 608 (1968), *cert. denied,* 394 U.S. 948, 89 S.Ct. 1284, 22 L.Ed.2d 482 (1969), the Court of Appeals found that the fact that the prosecutor had indicated that he might be disposed to drop indictments against certain witnesses did not affect the admissibility of those witnesses' testimony at defendant Earl Veney's trial. Later, in a post-conviction proceeding involving Samuel Veney, the Court of Appeals, noting that petitioner was not claiming that coercion of a witness resulted in her giving perjured testimony, stated that "[w]here testimony is not freely given, its probity is subject to evaluation by the trier of fact, but is certainly not reviewable on a post-conviction proceeding." *Veney v. Warden,* 259 Md. 437, 448, 271 A.2d 133, 140 (1970) (citations omitted). More recently, in *Ball v. State,* 57 Md.App. 338, 470 A.2d 361 (1984),[1] this Court, with little discussion, found that the voluntariness of coappellant Coley's confession was a personal constitutional concern of Coley and thus appellant Ball had no standing to raise the issue.

We distill the following general principles from the above-cited cases. First, a defendant has no standing to assert the fifth amendment right against self-incrimination on behalf of a witness; nor can he take advantage of a court's erroneous decision to disallow a witness's claim of privilege. Second, under normal circumstances, the voluntariness of a witness's statement affects its weight and credibility, not its admissibility. Third, although a defendant has no constitutional right to be free from incrimination,

---

1. Ball's subsequent petition for a writ of certiorari was denied by the Court of Appeals. See 300 Md. 88, 475 A.2d 1200 (1984). The Court of Appeals granted Wright's and Coley's petition and ruled on issues not here relevant. See *Wright v. State,* 307 Md. 552, 515 A.2d 1157 (1986).

under certain circumstances the violation of another's fifth amendment rights may rise to the level of a violation of defendant's constitutional right to a fair trial.

The question we must ultimately answer in the instant case is whether introduction of Blanchfield's statements to Groce and Schmoldt deprived appellant of a fair trial. We conclude that it did not.

First, although the court questioned whether the State would be permitted to use Blanchfield's out-of-court statements in a prosecution against Blanchfield, it further found, based on the facts before it, that the police did not overreach "to the point the Court should therefore deny the State the opportunity to present what they think is relevant material evidence" in the State's case against Pinder. The trial court essentially made a determination that the violation of Blanchfield's constitutional rights, if any, did not rise to the level of a violation of appellant's right to a fair trial.

Second, the threats of prosecution attributed to Groce and Schmoldt are far less egregious than the torture to which the witness who incriminated Bradford, *supra,* was subjected. That witness was beaten, kicked, and otherwise physically abused; he was interrogated by the police for at least twenty-four hours during which time he was deprived of food, drink, and sleep; he was told that his wife and children would be prosecuted if he did not confess. These indignities were suffered before and after the witness made statements incriminating Bradford. In addition, when the witness appeared before a magistrate for arraignment, the injuries he had sustained were visible. The magistrate also knew that the witness had been threatened by an assistant state prosecutor.

Third, (here we focus on Officer's Groce's conduct insofar as suborning perjury is concerned) we note that in questioning Blanchfield, who was called as the court's witness, the State did not lay a foundation for the introduction of the witness's prior inconsistent statements to Groce. More-

over, the defense's questions to Blanchfield elicited which portions of the statement to Groce were untrustworthy. Later, the court apprised the jury that Officer Groce had been disciplined for causing Blanchfield to falsify a portion of her statement and for asking Blanchfield for a date. Thus, the jury had before it all the facts necessary to determine whether Blanchfield's trial testimony was credible. Finally, only two excerpts from the statement to Groce were read to the jury by the court. One of the excerpts was the oath penned by Officer Groce. The jury was told that the oath was not in Blanchfield's handwriting. Additionally, defense counsel, after noting the reasons why the stipulated portions of Blanchfield's statements should not be introduced, agreed that the oath would be admitted.

■ Under these circumstances, we find that the trial court's decision to admit Blanchfield's statements for the limited purpose of impeaching her credibility did not deprive appellant of a fair trial.

Our finding of lack of unfairness is further bolstered by the fact that Blanchfield's testimony at trial in and of itself incriminated appellant. In response to questions posed by the court, Blanchfield disclosed that she received a telephone call from her brother around 4:00 a.m. on 18 January 1985. Her brother asked her for a ride from Millington. She further related that during the trip from Millington to Chestertown "I had asked him what happened to him, because his hand was swelled up, and he just said that he had got in a fight." She also said that her brother asked her "to drive through Dixon Valve [*i.e.*, the place where, according to Blackiston's earlier testimony, he had been beaten,] to see if this guy was still out there so that he could call an ambulance." On cross-examination by the State, Blanchfield admitted, among other things, that when her brother got in the car "[h]e had a little blood on his coat." Her cross-examination testimony also reveals as follows:

Q You stated when the Court asked you questions, I believe, that you drove through KRM [*i.e.*, Dixon Valve,] parking lot?

A Yes.

Q What were you looking for? Do you know?

A To see if the guy was in the ditch.

Q And you knew you were looking for a black guy, is that right?

A Yeah.

Q How do you know that?

A I just assumed it was a black guy, when Vernon said on the phone that he had either hurt a nigger or killed a nigger I figured it was a black man.

Finally, our review of the record persuades us that the trial court went to great lengths to determine that the statements made to Groce and Schmoldt were, except as discussed above, reliable. Blanchfield's responses to the numerous questions asked in this regard reveal that, since giving the statements, Blanchfield had had misgivings about making them and that she now remembered things differently or not at all. We also suspect that, since giving her statements, Blanchfield had learned a few things about "hearsay" information. The following testimony at the suppression hearing is illustrative of Blanchfield's change in recall:

Q Other than what you stated about the officer tell you to place something in there about meeting you in Kent Plaza, is the statement otherwise true?

A No.

Q What's false about it?

A It's true of what people told me, but it's not actually true of what I did. That's just what people have told me, so I don't know if it's the truth or it's not the truth.

Q Is it true about what your brother told you? The statements on there as to what your brother told you— are those true?

A To a point.

Q   How far to a point?   What's not true about the statement?

A   There's a lot of things I thought he said that he didn't say that Vernon said.

In sum, although we do not condone Officer Groce's misconduct, we do not believe that his treatment of Ms. Blanchfield or Blanchfield's subsequent treatment at the hands of the Deputy State's Attorney was so opprobrious as to require the exclusion of Blanchfield's statements at appellant's trial.   We reiterate that appellant was not deprived of a fair trial.

IV.

During defense counsel's cross-examination of Blanchfield, the following occurred:

Q   [By Defense Counsel]:  Did you ever see the officer again?

A   Yes, it was a while after that I stopped him down here by the bridge and asked him when would I have to go to court and he asked me to meet him—

[State's Attorney]:  Your Honor, I'm going to object to this line of questioning unless it has something to do with the statement that she already gave.

Q   [Defense Counsel]:  Absolutely, Your Honor.

Court:  No, I'll sustain the objection.

Q   [By Defense Counsel]:  Your Honor, may we approach the Bench?

Court:  Yes.

BEFORE THE BENCH:

[Defense Counsel]:  The conduct of Officer Groce occurred, if I'm not mistaken, after the statement given by her but before the statement given to Mrs. Schmoldt, and I think it would be very important for the jury to understand the durress [sic] that she was under.   And all of this flows—we go from Officer Groce and all of his actions and conduct directly to Mrs. Schmoldt, the Deputy State's Attorney.

Court: No, I don't think so. Your objection is noted. Sustain the objection. I'll stick with my ruling.

■ Appellant now complains that the court erred when it "refused to allow Ms. Blanchfield to testify about the officer's improper conduct toward her during the period of time between the two statements," *i.e.*, the statement to Groce and the statement to Schmoldt. Absent a more specific proffer as to what Blanchfield would have said, appellant's fourth claim of error is not properly before us. *Mack v. State*, 300 Md. 583, 603–04, 479 A.2d 1344, 1353–54 (1984). In other words, without a particularized proffer we have no way of knowing that Blanchfield's answers would have, as appellant suggests, described further misconduct on Groce's part.

In all probability the misconduct which appellant sought to question Blanchfield about concerned Officer Groce's subsequent solicitation of a date and we note that the jury learned of that conduct when the court read the parties' stipulation regarding the disciplinary action to which Groce was subjected. Consequently, we fail to see how appellant was prejudiced by the court's ruling.

## V.

State's witness Terrance Murray testified that he saw Blackiston, Pinder, and Walters at a tavern called Newt's on the night Blackiston was beaten. Specifically, Murray testified as follows:

Q [State's Attorney]: What happened? Did anything unusual happen after Linwood Blackiston left?

A Yeah—well, when Iwas [*sic*] about to leave Newt's at the time, some dude named Vernon—I seen—

Q Named who?

A Vernon.

Q Vernon?

A I guess that's his name. Vernon. That's what I know him by. He came in the bar and said—

Q You can't say anything he said.

A   Well, I didn't hear anybody talk but Vernon.

Q   Okay, but you still can't say what—I'm afraid you can't say anything Vernon may have said.   Did you observe anything about Vernon?   What his appearance was?

A   Yeah. *His appearance was like he actually stood there in front of other people saying, "Yeah, we got that nigger.   We got that nigger."* That's when I left Newt's.  [Emphasis added.]

[Defense Counsel]: Objection.

Court:  Yes, you can't repeat anything he said.   Only how he appeared.

A   He appeared like he had just got done—

Court:  Now wait a minute.   I haven't finished.   I will have to ask the jury to disregard, and I will strike from the record what he said that Vernon said.   That's not evidence in the case.

[Defense Counsel]: Your Honor, may we approach the Bench?

Court:  Yes.

BEFORE THE BENCH:

[Defense Counsel]: The evidence will show that there will be no method by which the State can produce any statement that he did anything to a nigger.   I believe what he has just done now is very harmful and I move for a mistrial.

Court:  I gave a correcting instruction and I will deny your motion.

END OF BENCH CONFERENCE.

Q   [State's Attorney]: Mr. Murray[,] was there anyone with this person called Vernon?

A   Yeah, Kelly Pinder.

Q   And is Kelly Pinder in court today?

A   Yeah.   Setting right there.

Q   Your Honor, we would ask the record to reflect that he pointed to the Defendant.

Court:  Alright [*sic*].

Q   What if anything—did you look at Kelly Pinder that night?

A   Yeah, I seen Kelly Pinder that night.  I didn't say anything to Kelly Pinder.

Q   What if anything, at this time you mentioned you saw Vernon, what if anything did you observe about Kelly Pinder's appearance?  The way he looked?

A   *Well his appearance was the same as Vernon's. In other words, like something was done that wasn't supposed to have been done.*  [Emphasis added.]

[Defense Counsel]:  Your Honor, I object.

Court:  You can't draw your own conclusions.  You can describe him, how he was dressed, what his clothes looked like, whether he had a hat on or not, his hair or something, but you can't draw conclusions as to what you think has happened.

■   Appellant now complains that the emphasized portions of Murray's testimony required the court to grant a mistrial.  We do not agree.  Appellant did not request a mistrial in connection with the statement describing appellant's appearance; he merely objected.  The judge in turn instructed the witness about the inappropriateness of his response, even though no such instruction was requested. Under these circumstances, there is nothing for us to review.  *See Smith v. State,* 69 Md.App. 115, 122–23, 516 A.2d 985, 989–90 (1986).  As to the witness's statement regarding Vernon, we believe the court's cautionary instructions removed the possibility of injury to appellant.  *See Myers v. State,* 58 Md.App. at 228, 472 A.2d at 1036.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.