STATE OF MAINE                                      UNIFIED CRIMINAL DOCKET

CUMBERLAND, ss                                  Nos. CR-20-2528

                                                    CR-20-2334

STATE OF MAINE

v.                                             ORDER

MARK GRAHAM,

            Defendant

On January 4 and September 2, 2021 the court held a hearing on motions to suppress filed by defendant Mark Graham, who is representing himself.[1] The motions were heard together and involved two seizures. First, Mr. Graham is seeking the suppression of cocaine found in an automobile that was searched on May 25, 2020, which resulted to misdemeanor drug possession charges against him in CR-20-2528. Second, Mr. Graham is seeking the suppression of a more substantial quantity of cocaine found on the following day, May 26, 2020, which led to felony trafficking charges against him in CR-20-3334.

Mr. Graham argues that the State did not have probable cause to search the automobile on May 25 and he argues that the seizure of cocaine on May 26 either was derived from the allegedly illegal May 25 search or resulted from other allegedly improper police conduct, specifically the State's alleged coercion of information from Christine McLellan . The State has the burden of proof by a preponderance of the evidence that probable cause existed for the May 25 search of the

---

[1] The hearing did not finish on January 4 and there was then a substantial delay before the hearing could be resumed for various reasons, including the fact that Mr. Graham was released on bail after January 4 but was then rearrested on new charges in CR-21-1511, which resulted in an evidentiary hearing before Justice O'Neil on a motion to revoke Mr. Graham's bail in CR-20-2528 and 20-2334. The hearing was also delayed by Mr. Graham's appeal of the decision on the motion to revoke and because Mr. Graham spent some time in the medical unit at the jail as set forth in the court's order dated July 23, 2021.

automobile. The State also has the burden of proof by a preponderance to demonstrate that evidence obtained on May 26 was not the fruit of an illegal search.

On the issue of whether there was any improper coercion of information from a witness, it is the court's view that – at a minimum – a defendant has to first make a substantial showing that improper coercion occurred before the State has to demonstrate that information was not provided voluntarily.[2] In addition, most or all of the prior decisions on this issue involve improper coercion of a witness who testifies at a trial, not alleged coercion to obtain information during an investigation. In any event, as discussed below, the court finds beyond a reasonable doubt, based on this record, that no improper police coercion occurred.

At the September 2 hearing, In response to Mr. Graham's request, the State produced as witnesses several law enforcement officers (including one who is now working in New Hampshire).

The court finds as follows:

Vehicle Search on May 25, 2020

On May 25, 2020 Agents Whiteman and Morrison of the MDEA were riding in an unmarked vehicle looking for open air drug activity when Whiteman saw a woman named Rebecca Adams sitting as a passenger in a vehicle parked in the lot next to a Walgreens on Congress Street.[3]

---

[2] *See LaFrance v. Bohlinger*, 499 F.2d 29, 35 (1st Cir. 1974). *Accord, United States v. Tavares*, 705 F.3d 4, 23 (1st Cir. 2013). The California Supreme Court has gone farther and ruled that when a defendant makes a motion to exclude the allegedly coerced testimony of a witness, the burden of proving improper coercion is on the defendant. *People v. Badgett*, 895 P.2d 877, 887 (Cal. 1995). Both *LaFrance* and *Badgett* involve the use of allegedly coerced witness testimony at trial rather than information allegedly coerced during the course of an investigation.

[3] Whiteman has since left his law enforcement job in Maine and now works for a police department in New Hampshire.

2

Whiteman told Morrison that he had seized drugs from Ms. Adams on prior occasions so the agents parked where they could monitor the area. They saw a black BMW driven by Mr. Graham enter the Walgreens parking lot and pull up next to the vehicle containing Ms. Adams.

Whiteman recognized Mr. Graham as someone suspected of involvement in drug trafficking based on information provided by Officer Jacob Demchek. Demchek had been assigned to investigate an incident several months earlier in which Mr. Graham had apparently been the victim of a robbery. In the course of that investigation Demchek had communicated with Mr. Graham by text.[4] Demchek had texted Mr. Graham to ask about a specific individual and received no response, but several days later he received an unsolicited text from Mr. Graham's phone number (apparently sent by mistake) from someone identifying himself as "Steve-O" and saying he would be good for a "pop", which Demchek knew was a common street term for cocaine or cocaine base.

After Mr. Graham's vehicle arrived, Agents Morrison and Whiteman saw Ms. Adams and the male driver of her vehicle get out of the vehicle and approach the BMW. The male interacted with Mr. Graham at the driver's side window of the BMW and then placed an item under his pants near his buttocks – rather than in a pocket – in a manner that Agent Morrison believed was intended to hide the item. At that point he believed he had observed a drug transaction.

Ms. Adams and the female passenger in Mr. Graham's car, later identified as Christine McLellan, walked out to Congress Street and then west toward the Bramhall Fire Station and returned several minutes later, which Agent Morrison also thought was suspicious because there had been reports that there had been drug transactions near the Fire Station. At that point Morrison believed he had reasonable articulable suspicion to stop Mr. Graham's vehicle but that was

---

[4] Some of the individuals who had possible involvement in that incident were suspected of being involved in drug crime.

unnecessary because Mr. Graham did not drive away but instead parked in a secluded space behind the Walgreen's lot.

Assisted by two uniformed Portland officers, Jacob Gibbs and Benjamin Noyes, as backup, Whiteman and Morrison approached Mr. Graham's vehicle and began speaking to him and to his passenger, Ms. McLellan. Mr. Graham conceded at the hearing and in a post-hearing filing that they had reasonable articulable suspicion to do so.

Video footage submitted by Mr. Graham shows that Officer Gibbs initially spoke to Mr. Graham to request his driver's license. When Ms. McLellan started to say something, Mr. Graham told her to "just shut up." After about 90 seconds Morrison began speaking with Mr. Graham at the driver's window. Shortly afterward Whiteman began speaking with Ms. McLellan at the passenger window.

After Morrison had been speaking with Mr. Graham for approximately three minutes, Officer Gibbs observed a glassine baggie on the pavement immediately below Mr. Graham's driver's side window, and he brought that to Morrison's attention. The baggie contained pills packaged in a way that was not consistent with prescription medication, and its location led Morrison to believe that it had been dropped there by Mr. Graham.

The video footage shows that about a minute later, after Morrison had been speaking to Mr. Graham for about four minutes, he had Mr. Graham exit the vehicle and began a search of the vehicle.[5] A digital scale with what appeared to be cocaine residue was found in the glove box and what appeared to be cocaine residue was found in the center console. Both tested positive for

---

[5] Ms. McLellan subsequently got out of the vehicle and when she did, Officer Noyes observed a needle and an elastic band, often used as a tourniquet for intravenous drug use, on the floor of the vehicle where she had been sitting. This was not observed until after the search of the vehicle had begun and cannot add to probable cause for the search of the vehicle.

cocaine using the True Narc presumptive test and form the basis for the misdemeanor charge in CR-20-2528.

Probable Cause

The issue before the court is whether the officers had probable cause to search Mr. Graham's vehicle. Under the so-called "automobile exception," the existence of probable cause justifies a warrantless seizure and reasonable search of a motor vehicle irrespective of the existence of exigent circumstances. *State v. Melvin,* 2008 ME 118 ¶¶ 14-15, 955 A.2d 245. Such a search may include searches of compartments within the vehicle, such as the glove box. *See California v. Acevedo,* 500 U.S. 565, 570 (1991).

Probable cause exists when the officers' knowledge, in combination with any reasonably trustworthy information conveyed to them, would warrant a prudent person to believe that the area to be searched contains contraband or evidence of a crime. *State v. Melvin,* 2008 ME 118 ¶¶ 14-15. In *State v. Martin,* 2015 ME 91, 120 A.3d 113, the Law Court noted that probable cause is a practical standard, not based on legal technicalities, that depends on the totality of the circumstances and that can be satisfied on less than a fair preponderance of the evidence. 2015 ME 91 ¶¶ 9-10, citing *Maryland v. Pringle,* 540 U.S. 366, 370-71 (2003).[6]

Applying that standard, the court finds that the law enforcement observations of the activity around Mr. Graham and his car, the apparent concealment of an item in the male's pants after an interaction with Mr. Graham at the driver's side window, and the presence of a glassine baggie containing pills on the ground below Mr. Graham's window, combined with the pre-existing

---

[6] The *Martin* case involved the search of a passenger, not merely the search of a vehicle, and the Law Court therefore had to consider exigent circumstances in addition to probable cause. *See* 2015 ME 91 ¶ 15.

information from Officer Demchek that Graham's phone number had been used to send a text referencing a drug transaction, constituted probable cause to search the vehicle.

Seizure of Drugs on May 26, 2020

The facts here are fairly straightforward. Based on information provided by Ms. McLellan on May 25, law enforcement officers began a surveillance in the area of the UPS store on Marginal Way the following evening. They had information that Mr. Graham, who had been bailed on the May 25 charge, was going to receive a shipment of cocaine base from out of state at that location and time. Although the State was reluctant to reveal the source of its information, Mr. Graham correctly surmised at the January 4 hearing that Ms. McLellan was the source. Whiteman confirmed that at the September 2 hearing.

Mr. Graham was seen going into the UPS store at approximately 7:15 pm on May 26 and emerging with a parcel. He then walked west on Marginal Way and turned in to an alley. Officer Joshua MacDonald, who was in a vehicle on Marginal Way, drove into the alley after Mr. Graham and saw Mr. Graham throw an object in the direction of a dumpster located in the alley. There was a UPS box at Mr. Graham's feet.

When law enforcement agents looked in and around the dumpster they found a bag containing a substance that field tested positive for cocaine base. The cocaine base constitutes the basis for the felony trafficking charge in CR-20-2334.

No evidence was obtained in a search of Mr. Graham or his possessions on May 26, and Mr. Graham had no expectation of privacy in the dumpster or the area around the dumpster. The court is not aware of any authority for the proposition that evidence obtained as a result of a

surveillance conducted in a public area should be suppressed because the police obtained the information to conduct that surveillance through allegedly improper means.

Mr. Graham originally contended that the evidence obtained on May 26 should be suppressed because there had been improper coercion of Ms. McLellan. The first problem with this argument is that the caselaw cited by Mr. Graham involves alleged coercion of witness testimony at trial, not allegedly improper coercion of information during an investigation. In any event, the only evidence in the record is that the information provided by Ms. McLellan was provided voluntarily, per Morrison's testimony, and because Ms. McLellan was hoping for leniency, per Whiteman's testimony (Ms. McLellan was apparently charged with drug possession or already had pending charges for drug possession). The court finds that testimony to be credible. Ms. McLellan was not made any promises. Ms. McLellan was not handcuffed and was not arrested.[7]

As noted above, the cases relied on by Mr. Graham in support of his improper coercion argument involve attempts to exclude allegedly coerced testimony at trial – as opposed to allegedly coerced information obtained during an investigation. Ordinarily a defendant can only assert violations of his own constitutional rights rather than the constitutional rights of third parties like Ms. McLellan. However, courts have been willing to consider a defendant's claim that a trial witness's testimony was involuntary on the theory that improperly coerced testimony may violate the defendant's right to a fair trial. *See United States ex rel. Cunningham v. DeRobertis*, 719 F.2d 892, 895-96 (7th Cir. 1983). In the *Cunningham* case the Seventh Circuit rejected such a claim

---

[7] Agent Morrison testified that he did not deal directly with Ms. McLellan but that he understood she received a summons and was allowed to leave.

for several reasons, one of which was that the allegedly coerced confession of another participant in the crime had not been introduced at defendant's trial. 719 F.2d at 896.

Even in the context of allegedly coerced witness testimony at a trial, the California Supreme Court has ruled that offers of leniency and offers to release a person from custody do not constitute improper coercion. *People v. Badgett,* 895 P. 2d at 891. In fact, the cases that have found improper coercion of witness testimony or have held that a hearing is required on that issue all involve instances where the defense had made a substantial showing of egregious conduct. *E.g., LaFrance v. Bohlinger,* 499 F.2d at 35 (substantial showing that a statement was "obtained by police threats and other blatant forms of physical and mental duress"); *Bradford v. Johnson,* 354 F. Supp. 1331 (E.D. Mich. 1972), *aff'd per curiam,* 476 F.2d 66 (6th Cir. 1973) (statement obtained by police beatings). No such showing has been made in this case

It is relevant that one argument for excluding coerced witness testimony at trial is that testimony obtained by improper coercion is sufficiently unreliable to potentially constitute a due process violation. In this case, however, the information obtained from McLellan – that Mr. Graham was going to receive a shipment of cocaine base from out of state at the UPS store during the early evening of May 26 – proved to be reliable.

The court finds no basis to suppress any evidence obtained on March 26 due to allegedly improper coercion.

At the September 2 hearing Mr. Graham changed his tack and alleged that the surveillance conducted at the UPS store on May 26 did not result from information obtained from Ms. McLellan but was somehow derived from the search of his automobile and person on the previous day. There is no evidence to support that theory except Mr. Graham's assertions that he does not believe the officers. There is no evidence that anything found in the search could have led the officers to

8

engage in surveillance at UPS the next day. The court, as noted above, finds that the surveillance resulted from information provided by Ms. McLellan.

Even if the evidence found in the search of Mr. Graham's automobile had been suppressed, the information obtained from Ms. McLellan was not the fruit of that search. The court is aware of no authority that information obtained from a third party present at the time of a search – but not information obtained in the search itself – may lead to suppression of evidence obtained on a subsequent occasion if the search is later found to have lacked probable cause. Such a ruling would stretch the poisonous tree doctrine beyond recognition.

Mr. Graham finally argues that he was entitled to cross-examine Ms. McLellan under the confrontation clause. However, the State was not obliged to call Ms. McLellan as a witness. Mr. Graham could have sought to subpoena her but he apparently did not do so.[8]

Moreover, the confrontation clause does not apply to suppression hearings. The U.S. Supreme Court has stated that the confrontation clause is a trial right and has never extended that right to pretrial hearings. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 52 , 53 n.9 (1987); *California v. Green*, 399 U.S. 149, 157 (1970): "It is this literal right to confront the witness <u>at the time of trial</u> that forms the core of the values furthered by the Confrontation Clause." (emphasis added). *Accord, Barber v. Page*, 390 U.S. 719, 725 (1968). The highest courts in two states have ruled that the confrontation clause does not apply to motions to suppress. *State v. Zamzow*, 892 N.W.2d 637 (Wisc. 2017); *State v. Rivera*, 192 P.3d 1213 (N.M. 2008). Those cases were decided after the Supreme Court's decision in *Crawford,* and to the court's knowledge there is no contrary authority.

---

[8] In fact, when he was out on bail, Mr. Graham sought an amendment to his existing bail conditions so that he could contact Ms. McLellan. That was denied after a hearing on February 11, 2021, but Mr. Graham was informed that he could apply for funds through MCILS to have a private investigator contact or subpoena her.

Mr. Graham's motions to suppress the evidence found in the search of the automobile on May 25, 2020 and to suppress the seizure of cocaine base on May 26, 2020 are denied.

Dated: September 27, 2021

Thomas D. Warren
Justice, Superior Court