**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 7 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA

    Plaintiff-Appellant,

    v.

CESAR GONZALES, also known as Cougar;
HECTOR GABRIEL LOPEZ, also known as Shaggy;
URIEL MARTINEZ, also known as Duke; CESAR
JUAREZ, also known as Pelon; GUSTAVO
AZCUENAGA, also known as Mono; LUIS
DELCID, also known as Stranger; ERNEST
GUEVARA, also known as Yogi; RUSSELL
BARBOA, also known as Chino; JOHN ACOSTA,
also known as Lefty; BYRON ZAMORA, also
known as Trigger; OSCAR VILLA, also known as
Wino; RICHARD ACOSTA, also known Shorty;
ROGER PRECIADO, also known as Cartoon;
JAIME VILLA, also known as Psycho; CHARLES
TAYLOR, also known as Yogie; URIEL
BUSTAMONTE, also known as Caps; MICHAEL
MORA, also known as M&M; DAVID
GALLARDO, also known as Cyclone; NEAL
POLUS, also known as Troy Thompson, also known
as Evil; FRANK LARA, also known as Spooky,

    Defendants,

    and

No. 97-2277

MARCOS MAZZINI, also known as Lucky; VINCENT NAJAR, also known as Stalker; JASON DELATORRE, also known as J Bone,

     Defendants-Appellees,

_____

ALBUQUERQUE JOURNAL,

     Intervenor.

Appeal from United States District Court
for the District of New Mexico
(D.C. No. CR-95-538-MV)

David N. Williams, Assistant United States Attorney (John J. Kelly, United States Attorney, and James R.W. Braun, Assistant United States Attorney, with him on the brief), Albuquerque, New Mexico, for the appellant.

Jeffrey J. Buckels (Gail Evans and Billy R. Blackburn with him on the brief), Albuquerque, New Mexico, for the appellees.

Before **ANDERSON**, **McKAY**, and **BRISCOE**, Circuit Judges.

**BRISCOE**, Circuit Judge.

The government appeals the district court's order suppressing statements made by a witness and barring the government from calling the witness at several criminal trials. We affirm in part, reverse in part, and remand for further proceedings.

-2-

A federal grand jury returned an indictment in 1995 charging numerous alleged "Sureno 13" members with RICO, RICO conspiracy, murder, conspiracy to murder, attempted murder in aid of racketeering, and narcotics trafficking offenses. Several defendants were charged with participation in the drive-by shooting and murder of rival street gang member Patrick Garcia.

In April 1996, law enforcement officers conducting the investigation requested a warrant for the arrest of the subject witness. The witness was allegedly associated with the Sureno 13 gang, was a key witness to events involving the murder of Garcia, and was a witness to the structure of the gang's RICO organization and to drug trafficking crimes committed by members of the gang. At the time the arrest warrant was sought, the witness was in a drug rehabilitation program as a condition of probation for an earlier unrelated state crime. The state court issued the warrant and, on its own accord, added an "escape clause" providing that she be arrested and held in a juvenile detention home

> unless: Upon law enforcement officer apprehension/arrest of [the witness], if--but only if--she cooperates fully and truthfully and accurately and completely reveals to Albuquerque Police Detective Richard Lewis, and/or ATF Special Agent Gary Ainsworth, and/or Assistant US Attorney Tom English, and/or Special Assistant US Attorney Reynaldo Montano her information and involvement (if any) in aforesaid crimes, then--but only then--arresting officers are authorized to leave her at the place she currently is residing, and report the aforesaid to this Court/Judge for further instructions regarding her arrest and aforesaid charges.

Record V. Doc. 1808, Ex.A.

Albuquerque Police Detective Lewis and ATF Agent Ainsworth went to the

rehabilitation facility in the state of Washington to meet with the witness on May 1, 1996. At the request of Lewis and Ainsworth, the director of the rehabilitation program was present during the first fifteen to thirty minutes of the meeting. Lewis told the witness they had a warrant for her arrest, showed her the affidavit in support of the arrest warrant, and advised her of her rights. The witness asked to talk to her probation officer. After she talked to her probation officer, the witness stated the information in the affidavit was substantially correct and that she wanted to cooperate in the investigation. At some point during the meeting, the witness asked to look at the arrest warrant and, for the first time, noticed the escape clause. Approximately three weeks later, Lewis and Ainsworth, accompanied by English and ATF Supervisor McCall, returned to the rehabilitation facility to again interview the witness, and she made further statements incriminating defendants.

On May 28, 1996, the federal district court ordered the government to give defense counsel access to all witnesses under its control or protection. The order stated "'[t]he better procedure is to allow the defense counsel to hear directly from the witness whether he would be willing to talk to the defense attorney, either alone or in the presence of his attorney'" (citing United States v. Walton, 602 F.2d 1176, 1180 (4th Cir. 1979)). Record II, Doc. 715 at 5. The order further provided the government was to provide "face-to-face encounter[s] between [its] witnesses and defense counsel." Id.

A defense investigator located the subject witness in mid-July and asked if she

would talk to him about her knowledge of defendants' roles in the charged crimes. The witness told the investigator she would talk to him after she talked to "her attorney." She called McCall and complained that a defense investigator was harassing her and trying to talk to her. McCall and English told her she did not have to talk to anyone. The next day, the witness again called McCall to complain about the investigator. McCall and English went to the rehabilitation facility the following day and the witness signed a cooperation agreement with the government on July 15, 1996. After the witness signed the cooperation agreement, English instructed her to call the defense attorney who had engaged the investigator and tell him she did not want to talk to defense representatives. English also threatened defense team members with prosecution if they continued to "harass" government witnesses.

The witness left the rehabilitation facility on August 22, in violation of her probation, and a state arrest warrant was issued. On September 4, 1996, the federal district court conducted a hearing on a defense motion for disclosures of witness identities pursuant to <u>Roviaro v. United States</u>, 353 U.S. 53 (1957). The court ordered that the witness be produced for an interview with defense counsel, but English misrepresented the witness' status, stating: "She's not under our control. . . . We have nothing to do with her." Record XIII at 257. Consequently, the court did not order the government to produce the witness, but merely requested that the government facilitate a meeting between the witness and defense counsel.

On October 24, while the witness was ostensibly still missing, the government issued its first payment to her. Although it is clear the government knew the whereabouts of the witness, it failed to give defense counsel access to the witness as ordered. The witness turned herself in on December 2, 1996. At a hearing on December 3, the government stated the witness would enter another rehabilitation program and the witness was ordered to seek psychological treatment.

English again misrepresented the witness' status to the federal district court on January 28, 1997, stating the witness "is not under my control whatsoever, and her whereabouts are not even known to me at this time." He stated she "was a fugitive for a time period, and since that time she is not under our control." Record XXII at 54. Defense counsel explained the witness was on probation and reporting regularly to the state court. On February 20, 1997, the government was sanctioned for not providing witness statements within a reasonable time after the witnesses had been interviewed by the government. The court ordered the government to make witnesses available for depositions.

The subject witness was deposed by defense counsel on March 7, 1997. Although English had available to him the arrest warrant for the witness, he failed to provide a copy to defense counsel prior to the deposition. During the deposition, defense counsel asked for a copy and English responded by saying he would provide it as soon as possible. At the end of the deposition, English said, "Oh look, here it was with my notes all along."

Record V, Doc. 1808, Exh. H. Defense counsel filed affidavits stating the lack of copies of the warrant and affidavit impaired their ability to examine the witness.

Subsequently, three defendants moved to dismiss all counts related to the Garcia murder as a sanction for government misconduct, arguing the arrest warrant was used unlawfully to coerce the witness' statements and testimony. The federal district court concluded the warrant was invalid and was used to coerce the witness into making statements incriminating herself. The court further found the government had violated court orders and had made misrepresentations to the court. The court did not dismiss the counts, but instead suppressed the witness' statements and barred the government from calling her as a witness at trial.

### Voluntariness of subject witness' statements

As an initial matter, we must decide whether it was proper to allow defendants to challenge the voluntariness of the subject witness' statements to Lewis and Ainsworth. Obviously, defendants cannot seek to vindicate any violations of the subject witness' Fifth Amendment rights. See Clanton v. Cooper, 129 F.3d 1147, 1158 (10th Cir. 1997). Instead, defendants must point to violations of their own constitutional rights. Id. Although defendants' rights were in no way affected by Lewis and Ainsworth obtaining the subject witness' statements, see Buckley v. Fitzsimmons, 20 F.3d 789, 794-95 (7th Cir. 1994) ("Overbearing tactics violate the right of the person being interrogated to be free from coercion."), subsequent use of those statements could potentially implicate

defendants' due process rights. See Clanton, 129 F.3d at 1158. More specifically, defendants' due process rights would be implicated if the subject witness was coerced into making *false* statements and those statements were admitted against defendants at trial. Id. We therefore proceed to determine whether, as concluded by the district court, the subject witness' statements were coerced.

Whether a statement is voluntary is a question of law subject to de novo review, although specific underlying findings of fact are reviewed for clear error. A statement "is involuntary if the government's conduct cause[d] the [witness'] will to be overborne and 'his capacity for self-determination critically impaired.'" United States v. McCullah, 76 F.3d 1087, 1100 (10th Cir. 1996) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973)), cert. denied 117 S. Ct. 1699 (1997). In determining whether a statement was freely and voluntarily given, the courts consider the totality of the circumstances. Arizona v. Fulminante, 499 U.S. 279, 285-86 (1991). The relevant circumstances embrace "both the characteristics of the accused and the details of the interrogation." Schneckloth, 412 U.S. at 226; Lucero v. Kerby, 133 F.3d 1299, 1311 (10th Cir. 1998). Relevant factors include the suspect's age, intelligence, and education, the length of detention and questioning, the use or threat of physical punishment, whether Miranda warnings were given, the accused's physical and mental characteristics, the location of

the interrogation, and the conduct of the police officers.[1]  Lucero, 133 F.3d at 1311.

In deciding initially to suppress the witness' statements and bar her from testifying at trial, the district court focused almost exclusively on the escape clause language of the arrest warrant.  In particular, the court concluded the warrant "was blatantly tailored to obtain information and testimony" from the witness because she "could escape arrest [only] if she divulged everything she knew about the Garcia homicide."  Record VII, Doc. 2011 at 10.  Notably, the court's initial order contained no factual findings concerning whether or when the witness was informed of the escape clause provision.

Pursuant to the government's motion for reconsideration, the district court considered supplemental testimony from Lewis and the subject witness concerning what events led to the witness' decision to confess and cooperate.  Lewis testified he informed the witness "she was under arrest for a warrant issued out of the State of New Mexico," Record XXV at 742, read the charges in the warrant to the witness, allowed her to read the affidavit in support of the warrant, and informed the witness of her *Miranda* rights. According to Lewis, the witness responded by asking to contact her probation officer.

---

[1] We reject the government's argument that a non-defendant witness' statement that incriminates a defendant is subject to suppression only if the statement was the product of torture or extreme coercion beyond the level of coercion required for suppression of a defendant's own confession.  As we noted in Clanton, "methods offensive when used against an accused do not magically become any less so when exerted against a witness."  129 F.3d at 1158.  Consequently, the standard for determining whether a statement was voluntary is the same whether we are dealing with a defendant or a third-party witness.

After she spoke by telephone to her probation officer, she informed Lewis "that the information in the affidavit was substantially correct and that she wished to cooperate with [him] in [the] investigation." Id. at 778. Lewis testified that "[s]ometime during the interview after this point, after [they] had been speaking together for a period of time, [the witness] asked to look at the warrant again." Id. In response, Lewis gave her the entire warrant, including the portion containing the escape clause.

In her deposition, the witness testified she understood when Lewis and Ainsworth asked to talk to her that she might be charged with conspiracy and other crimes. She testified the agents informed her of her right to have an attorney, but she declined "[b]ecause [she] didn't feel [she] needed an attorney." Record VII, Doc. 2019, Exh. A at 16. Although she testified the warrant provided she was not to be removed if she cooperated with the agents, she did not testify specifically as to when she first learned of the escape clause in the warrant. Moreover, she could not remember what the agents told her before she started giving her statement.

In denying the government's motion for reconsideration and affirming its decision to suppress the witness' statement and testimony, the district court rejected Lewis' testimony that the witness was not shown the escape clause prior to agreeing to cooperate. In particular, the court stated: "As with other assertions in his testimony, the Court did not find Detective Lewis to be credible on this point, due to his demeanor in responding to questions posed to him by defense counsel at the hearing." Record VII, Doc. 2055 at 58-

59. Ultimately, the court concluded that "[w]hether Ms. Tello was actually shown and allowed to read the full warrant prior to her decision to cooperate with the Government is of little significance, as [the witness'] sworn testimony at her . . . deposition indicates that she was fully aware of the 'choice' the officers were presenting to her when she decided to cooperate." Id. at 59.

After reviewing the record on appeal, we conclude the district court's factual findings in this regard were clearly erroneous. Although we generally defer to a trial court's credibility determinations, see Manning v. United States, 146 F.3d 808, 813 (10th Cir. 1998); United States v. Hunicutt, 135 F.3d 1345, 1348 (10th Cir. 1998), the district court in this case rejected Lewis' testimony out-of-hand, even though there was no evidence to contradict it. In particular, Lewis' testimony that the witness was not aware of the escape clause until after she admitted to the facts in the affidavit and agreed to cooperate was not contradicted by the witness' testimony. To the contrary, the witness did not indicate when she first learned of the escape clause and her testimony can therefore be read in complete harmony with Lewis' testimony. We are thus left with the conclusion that the district court had no evidentiary support for its finding that the witness "was fully aware of the 'choice' the officers were presenting to her when she decided to cooperate." Record VII, Doc. 2055 at 59.

Having rejected the district court's finding that the witness was aware of the escape clause prior to her admission and agreement to cooperate, we find nothing else in the

record to persuade us her statements were coerced. Although the court repeatedly referred to the witness as a "juvenile," the uncontroverted facts indicate she was eighteen years old at the time of arrest and entitled to be treated as an adult. In any event, the court's suggestion that the witness should have been allowed to speak to her parents is incorrect. See, e.g., United States v. Doe, 155 F.3d 1070, 1073 (9th Cir. 1998) (en banc) (no due process requirement that juvenile's parents be notified for waiver of *Miranda* rights to be valid); Stone v. Farley, 86 F.3d 712, 717 (7th Cir. 1996) (neither federal statutory nor constitutional law requires juvenile's parents be notified prior to obtaining confession), cert. denied, 117 S. Ct. 973 (1997). Further, although the district court found the witness "had only minutes to make her decision, with no help from an attorney . . . or a judge," we find nothing coercive from these findings when considered in light of all of the circumstances. Record VII, Doc. 2055 at 54. The witness' deposition testimony clearly indicates she understood she had the right to consult with an attorney, but knowingly chose not to do so. Further, there is no authority to support the notion that the witness was entitled to speak with a judge prior to making her decision. The uncontroverted facts indicate the witness was not pressed for an immediate decision, but instead was given the opportunity, at her request, to speak by telephone with her probation officer.

Ultimately, we conclude the subject witness' statements were not coerced and the district court erred in concluding otherwise. We therefore reverse the court's suppression

order to the extent it was based on its conclusion that the statements were involuntary.[2]

## Supervisory Power

The district court's suppression order was also based in part on the exercise of its supervisory powers. More specifically, the court concluded suppression of the subject witness' statement and trial testimony was a proper sanction for perceived government misconduct in obtaining the arrest warrant, allegedly coercing the witness' statements, and thereafter preventing the defense from contacting her.

The district court concluded the arrest warrant was invalid. In particular, it concluded the warrant was federal in character, but failed to satisfy relevant provisions of federal law. We find it unnecessary to review the court's findings in this regard because defendants lack standing to challenge violations of the witness' Fourth Amendment rights. See United States v. Padilla, 508 U.S. 77, 81-82 (1993); United States v. Payner, 447 U.S. 727, 731-32 (1980). Further, we conclude the court's supervisory powers did not authorize it to order suppression of the witness' statements and testimony based upon any perceived violations of the witness' Fourth Amendment rights.

The district court's suppression order was also based in part on its finding that the

___

[2] Because we conclude the witness' statements were voluntary, there is no presumption that those statements were false or otherwise unreliable. Accordingly, we find no indication that defendants' due process rights will be affected by admission of the witness' statements, or by the witness testifying, at trial. Further, we find it unnecessary to address what procedures a district court should follow in the event that proffered statements from a third-party witness are proven to be involuntary.

-13-

witness' statements had been coerced. Because we have concluded the government did not act improperly in obtaining the witness' statements, we cannot approve of any sanction imposed by the court on that basis.

We find firmer footing in the district court's finding that the government knowingly and intentionally violated discovery orders and misrepresented the witness' status and whereabouts to the court and defense counsel. Although Fed. R. Crim. P. 16 is inapplicable here because it does not require the government to make its witnesses available for defense interviews, it is "a helpful point of reference for our analysis by describing the district court's authority to remedy discovery infractions in analogous circumstances." See United States v. Russell, 109 F.3d 1503, 1510-11 (10th Cir.), cert. denied, 117 S. Ct. 2525 (1997). District courts have broad discretion in imposing sanctions on parties who violate discovery orders, and we review a court's decision to impose sanctions and its choice of sanction for abuse of discretion. United States v. Ivy, 83 F.3d 1266, 1280 (10th Cir.), cert. denied, 117 S. Ct. 253 (1996). Under Rule 16, sanctions may include prohibiting the disobedient party from introducing evidence not disclosed earlier. See United States v. Wicker, 848 F.2d 1059 (10th Cir. 1988). Even where Rule 16 is inapplicable, the courts have discretion to exclude evidence as a sanction for violation of a discovery order. Russell, 109 F.3d at 1510-11.

Based upon our review of the record, we conclude the district court did not abuse its discretion in choosing to sanction the government for what were obvious discovery

violations. Although the defense had no right to interview the witness under Rule 16, it had a right to be free from prosecution interference with a witness' freedom of choice about whether to talk to the defense. See United States v. Pinto, 755 U.S. 150, 152 (1985); United States v. Troutman, 814 F.2d 1428, 1453-54 (10th Cir. 1987). This right was emphasized in the court's order of May 28, 1996, which directed the government to provide "face-to-face" access to its confidential witnesses.[3] See United States v. Carrigan, 804 F.2d 599, 603-04 (10th Cir. 1986) (district court has power, at least in unusual circumstances, to order taking of adverse witnesses' depositions in criminal cases and to prevent government interference with defense access to potential prosecution witnesses). The government's response to the defense investigator's attempt to interview the subject witness clearly interfered with defense access and "violated the spirit and mandate of the Court's May 26 order." Record VII, Doc. 2055 at 71. In addition to this violation, the government misled the court and defense counsel, on repeated occasions, concerning its knowledge of the witness' whereabouts and its control over her. Finally, the government inexcusably delayed disclosure to defendants of the arrest warrant and reports of government interviews with the witness.

We now turn to the question of the appropriateness of the sanction selected by the district court. In selecting a proper sanction, a court should typically consider (1) the

---

[3] Because the government did not appeal this order, we do not pass on whether it was appropriate under the Federal Rules of Criminal Procedure.

reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to defendant as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance. Russell, 109 F.3d at 1511. The court should impose the least severe sanction that will accomplish prompt and full compliance with the discovery order. Ivy, 83 F.3d at 1280.

The district court in this case effectively considered the three factors. After reviewing the record, we agree with the court that the government's conduct was the product of flagrant bad faith and that defendants' ability to prepare for trial was prejudiced by the government's obstruction of access to the subject witness. However, we do not share the court's view that the prejudice to defendants was irreparable. In particular, we are not convinced the witness' testimony is forever "tainted" by the government's discovery violations. Indeed, we find no record support whatsoever for that conclusion. Accordingly, we reject, as an abuse of discretion, the court's conclusion that "[t]he problems attendant with the Government's misconduct . . . cannot be cured by granting the defense a continuance." Record VII, Doc. 2055 at 115.

We further conclude the district court abused its discretion in imposing what was obviously the most severe available sanction, i.e., complete suppression of the witness' statements and trial testimony. In reaching this conclusion, we emphasize the Supreme Court has never approved exclusion of evidence as a sanction for government misconduct in the absence of a constitutional violation or statutory authority for such exclusion.

-16-

Indeed, the Court has emphasized that "penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve." United States v. Ceccolini, 435 U.S. 268, 279 (1978). Here, we are convinced the sanction of total exclusion is too severe and hinders, rather than forwards, the "public interest in a full and truthful disclosure of critical facts." Taylor v. Illinois, 484 U.S. 400, 412 (1988).[4] Accordingly, we find it necessary to remand to the district court for consideration of less severe sanctions. Although the court is free to fashion an appropriate remedy, possible sanctions could include, among other things, allowing the witness to be redeposed by defense at government expense, censuring or fining the government attorneys involved in the misconduct, or recommending disciplinary proceedings against the government attorneys involved.

The judgment of the district court is AFFIRMED in part and REVERSED in part, and this case is REMANDED for further proceedings consistent with this opinion.

---

[4] Although the dissent suggests Taylor supports the district court's sanction of exclusion, a review of Taylor demonstrates it is factually distinguishable from the case at hand. In particular, the discovery violations in Taylor occurred during trial, not well beforehand. That difference alone is pivotal.

No. 97-2277, United States v. Gonzales et al.

**McKAY** , Circuit Judge, concurring in part and dissenting in part:

Although I concur in most of the majority's opinion, I cannot agree with its determination that the district court's sanction which precluded the government's witness' testimony and statement was an abuse of discretion. The majority "agree[s] with the [district] court that the government's conduct was the product of flagrant bad faith and that the defendants' ability to prepare for trial was prejudiced by the government's obstruction of access to the subject witness." Ante, at 16. The majority states, however, that it does "not share the [district] court's view that the prejudice to defendants was irreparable" because it is "not convinced that the witness' testimony is forever 'tainted' by the government's discovery violations." Id. The majority concludes that the district court abused its discretion in two manners: (1) in concluding that the government misconduct could not be cured by a continuance, and (2) in imposing the most severe sanction available. See id. I respectfully dissent from this conclusion because I believe that the majority has disregarded controlling Supreme Court precedent, has misinterpreted Tenth Circuit law which frames the analysis for the imposition of sanctions, and has taken the "discretion" out of the abuse of discretion standard.

The district court is invested "with broad discretion in coping with discovery order violations." United States v. Russell, 109 F.3d 1503, 1510 (10th Cir.), cert. denied, __ U.S. __, 117 S. Ct. 2525 (1997); see also United States v. Wicker, 848 F.2d 1059, 1060 (10th Cir. 1988). As noted by the majority, although Federal Rule of Criminal Procedure 16 does not govern this case, it provides guidance in analogous circumstances. Rule 16 provides that if a party fails to comply with a discovery order, "the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Fed. R. Crim. P. 16(d)(2). In Wicker, we approved of the district court's reliance upon three factors to evaluate sanctions imposed on the government for its discovery violations. Those factors are (1) the reasons for the delay, "including whether or not the government acted in bad faith when it failed to comply with the discovery order; (2) the extent of prejudice to the defendant as a result of the government's delay; and (3) the feasibility of curing the prejudice with a continuance." Wicker, 848 F.2d at 1061. In this case, the majority concedes that the court "effectively considered the three factors," ante, at 16, but concludes that the district court abused its discretion as to factors two and three. In making this determination, the majority not only ignores the Supreme Court's decision in Taylor

-2-

v. Illinois , 484 U.S. 400 (1988), in which the Court framed the analysis for a sanction excluding a witness' testimony, but it also misinterprets the test in Wicker .

Taylor involved the exclusion of an alibi witness of whom the defense had known but had failed to disclose in response to the government's pretrial discovery request. The defendant challenged the trial court's exclusion of the witness as a sanction for the discovery violation, alleging that it violated his right to present witnesses under the Compulsory Process Clause of the Sixth Amendment. In determining whether a preclusion sanction is appropriate, the Court mandated that a trial court exercise its discretion by balancing a defendant's fundamental right "to offer the testimony of witnesses in his favor" against countervailing public interests. Id. at 414. These interests include "[t]he integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process." Id. at 414-15. The trial court may also consider the willfulness of the violation, the simplicity of compliance with the discovery obligation, and whether some unfair tactical advantage has been sought. See id. at 415-17. In light of these factors, the Court upheld the exclusion of the defendant's witness. The Court emphasized that the defendant had acted willfully and in bad faith in not disclosing the witness until the second day of trial after the prosecution's primary witness had

-3-

testified.  See id. at 416-17.  Therefore, the Court stated, "Regardless of whether prejudice to the prosecution could have been avoided [by a less severe sanction] . . . , it [was] plain that the case fit[] into the category of willful misconduct in which the severest sanction [was] appropriate."  Id. at 417.

In this case, the district court determined that the nature of the government's misconduct, i.e., its repeated bad faith and its inexcusable, intentional violations of discovery orders, required the severest sanction.  The question before this court is not whether this sanction was the remedy we would have chosen, or even whether we think the remedy is unduly harsh.  Despite the majority's statement to the contrary, the district court was not *required* to impose a less severe sanction even if it determined that a sanction such as a continuance could minimize the prejudice to Defendant.  Although a milder sanction may diminish the prejudice caused by the discovery violation, where bad faith is the reason for the violation, see id. at 417, a lesser alternative would be less effective and "would perpetuate rather than limit . . . the harm to the adversary process."  Id. at 413.  It is the court's role to manage the adversary process and, when it finds in its broad discretion that it is necessary, to punish blatant and intentional violations of the structures inherent in that process.  Here, as in Taylor, the discovery violations were inexcusably deliberate, in bad faith, and sufficiently serious to warrant the severe sanction of witness preclusion.  Guided by the standard governing civil cases, duly noted by the

-4-

Supreme Court in Taylor, the district court limited the preclusion sanction in this case to flagrant misconduct, "where the uncooperative party demonstrate[d] a 'deliberate contumacious or unwarranted disregard of the court's authority.'" Id. at 417 n.23 (citations omitted). Because the district court sanctioned the government primarily for its intentional and misleading discovery violations, I do not see how the majority can ignore the principles set forth in Taylor to find an abuse of discretion. The district court was within its discretion to determine that the government's misconduct fit "into the category of willful misconduct in which the severest sanction [was] appropriate." Id. at 417. There can be no abuse of discretion in this instance.

Further, the court's analysis of the Wicker factors misconstrues the limits of those factors. There is no evidence that the district court failed to consider the important factors set forth by Wicker. As noted above, the majority concedes that the court "effectively considered the three factors." Ante, at 16. Nor does the majority dispute that the government's discovery violations were knowing, intentional, and a product of willful bad faith, which satisfied the first Wicker

factor.[1] Nevertheless, the majority rejects the district court's conclusion under Wicker that the government's misconduct could not be cured by a continuance. Notably, the majority does not explain why it rejects the court's view that the prejudice from this egregious misconduct was so irreparable that it demanded the exclusion of the witness. More importantly, neither Taylor nor Wicker requires that the harm or prejudice to the defendant be irreparable. In fact, Taylor and numerous circuit courts including this one have informed us that if bad faith is the reason for the violation, as it indisputably was in this case, prejudice to the other party need not exist at all. See Taylor, 484 U.S. at 413, 417 (emphasizing that the defendant's willful bad faith alone would justify suppression even if the prosecution suffered no prejudice or if a lesser sanction would minimize any prejudice); Russell, 109 F.2d at 1512 (stating that "if bad faith were involved, exclusion would have been proper regardless of prejudice or the feasibility of a continuance"); United States v. de la Cruz-Paulino, 61 F.3d 986, 995 (5th Cir. 1995) ("Where governmental noncompliance is the result of bad faith, exclusion of the undesignated evidence may be appropriate."); cf. Eckert v. Tansy, 936 F.2d 444, 446 (9th Cir. 1991) (determining that bad faith of defendant and ease of

---

[1]As in Taylor, the government in this case could easily have complied with the discovery orders. Also, I note that, if the court's May 28, 1996 discovery order was inappropriate, the proper response by the government would have been to appeal that order, not to willfully and intentionally violate it. The government, however, did not object to that order.

compliance with alibi statute supported exclusion of proffered witness); United States v. Cueto, 628 F.2d 1273, 1276 (10th Cir. 1980) (stating that suppression of evidence was not justified without evidence of government's willful withholding of exculpatory material).

Thus, contrary to the majority's analysis, the three Wicker factors are not dispositive. This court emphasized in Russell what we stated in Wicker: The Wicker factors "do not dictate the bounds of the court's discretion." See Russell, 109 F.3d at 1511. We specifically explained in Russell that, although the Wicker factors always should be considered, "Wicker itself states explicitly that its factors are neither exhaustive nor dispositive." Id. at 1151 n.6 (interpreting Taylor as allowing courts to weigh Wicker factors and consider one factor more compelling than another). In short, the Wicker factors are merely guidance for the court in its consideration of sanctions. See Wicker, 848 F.2d at 1061. The majority's second-guessing of the court's finding of prejudice is inapposite. The district court's decision to impose a preclusion sanction, based on its determination that the government's discovery violations knowingly caused delay and were intentionally misleading, was not an abuse of discretion under Supreme Court and Tenth Circuit precedent.

I also dissent because I believe that the court's analysis of the sanction question defeats the meaning of our abuse of discretion standard of review and

-7-

creates a double standard. Courts have often determined that a court's preclusion sanction is not an abuse of discretion where the offending party is the defendant. See, e.g., Russell, 109 F.3d at 1511-13; Eckert, 936 F.2d at 446; Chappee v. Vose, 843 F.2d 25, 31-32 (1st Cir. 1988). When a court determines that a sanction is justified by bad faith discovery violations, the structural analysis should not change according to whether the party is the criminal defendant, the prosecution, a civil plaintiff, or a civil defendant. The analytical difference between these situations occurs when a criminal defendant's constitutional rights are implicated by the suppression of his witness. In that instance, the question is whether preclusion is so harsh a sanction as to offend the Constitution. See Taylor, 484 U.S. at 409. Because the abuse of discretion standard is much less demanding than the constitutional one, the district court's discretionary determination in this case is even more compelling than the Supreme Court's decision in Taylor. While Taylor implicated overriding Sixth Amendment concerns, this case affects only the government's ability to present one witness in its prosecution of Defendants. The majority's analysis not only fails to give the district court's decision the deference it deserves but also it applies a seemingly more lenient standard to misconduct by government attorneys than to misconduct by criminal defense counsel.

Finally, to ascertain whether the preclusion sanction violated the defendant's constitutional rights in Taylor, the Supreme Court also examined whether "the

client should be held responsible for his lawyer's misconduct." Id. at 417. The Supreme Court held that, putting aside "the exceptional cases in which counsel is ineffective, the client must accept the consequences" of the lawyer's management of the trial. Id. at 418. The Court's determination in Taylor reflects the implicit balancing of the interests of the client against the integrity of the adversary process. This analysis is contrary to the majority's underlying view, which positions the people against the defendant by determining that the preclusion sanction is too harsh. Just as criminal defendants must accept the consequences of their lawyers' trial management decisions, so must the government accept the consequences of and take responsibility for the conduct of its lawyers. Rewarding the government with lenient sanctions for its willful misconduct effectively punishes the defendant and, in my view, is inequitable. For these reasons, I respectfully dissent and would not remand the case for consideration of less severe sanctions.