STATE of Wisconsin, Plaintiff-Respondent,†

v.

Stanley A. SAMUEL, Defendant-Appellant.††

Court of Appeals

*No. 99–2587–CR. Oral argument October 4, 2000.—Decided December 27, 2000.*

2001 WI App 25

(Also reported in 623 N.W.2d 565.)

†Petition to review granted.
††Petition to cross-review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of and oral argument by *Robert R. Henak* of *Henak Law Office, S.C.*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Lara M. Herman,* assistant attorney general, and *James E. Doyle,* attorney general. There was oral argument by *Lara M. Herman*.

Before Brown, P.J., Nettesheim and Snyder, JJ.

¶ 1. BROWN, P.J.   This is a case where the State introduced into its case-in-chief a prior statement of a hostile prosecution witness who then claimed that the statement was a product of government coercion. She asserted that she was compelled to tell a lie in order to implicate the defendant, Stanley A. Samuel, as the perpetrator of a second-degree sexual assault upon her. The issue is whether Samuel had standing to object to the admission of that prior statement on grounds that the witness's statement was coerced. We conclude that he did and thus reverse the trial court's order to the contrary. Our decision necessitates a reversal of all Samuel's convictions, at least for the time being, for reasons we will explain in the opinion. We remand with specific directions which we will also detail. Samuel also raises sufficiency of the evidence issues relating to the interference with child custody and abduction convictions, but we hold the evidence was sufficient.

¶ 2. Samuel was convicted of the following charges: interfering with child custody contrary to WIS. STAT. § 948.31(2) (1997–98),[1] abducting another's child contrary to WIS. STAT. § 948.30(1)(a) and second-degree sexual assault of a child contrary to WIS. STAT. § 948.02(2), all as a repeat offender. The convictions grow out of the following facts: On January 26, 1996, Tisha L., age fifteen at the time, left Oshkosh in a car driven by Samuel, age forty-six at the time. The pair first traveled to Milwaukee for a few weeks and then left Wisconsin until March 9, 1997, when police in Missouri stopped them. They were both then returned to Wisconsin where Tisha gave birth to a daughter on March 10, 1997. Samuel is the father of the child.

## WITNESS'S ALLEGEDLY INVOLUNTARY STATEMENT

¶ 3. We will only relate those facts necessary to the first issue at this point. The facts relating to the other two convictions will be discussed later. Two days after the birth of Tisha's daughter, March 12, 1997, a nonsecure detention hearing was held. At that hearing, Tisha's father, Peter, was given custody of Tisha and the Winnebago County Department of Social Services was given custody of her child.

¶ 4. On the same day, an intake conference took place, the purpose of which was to determine where the baby should be temporarily placed pending a March 15 hearing to determine permanent placement. An intake worker, the corporation counsel, a social worker and Tisha's attorney were present during the entire conference. Peter, his girlfriend Catherine and a police officer

---

[1] All references to the Wisconsin Statutes are to the 1997–98 version.

were in attendance during the latter half of this conference. Tisha did not receive temporary placement at this conference. It is at this conference where Tisha claims that the police and the government employees threatened her with the loss of her baby unless she helped them prosecute Samuel. Tisha claims that to get her baby, she lied to the police and told them what they wanted to hear—namely, that she and Samuel had sex while in Wisconsin. Samuel brought a motion to suppress the statement prior to trial and the court held an evidentiary hearing on the matter. Following is an account of the evidence taken at that hearing.

¶ 5.  Tisha testified that during the intake conference, she was asked a number of questions, among them being who she had sex with, when and where. She refused to answer these questions because she felt that they were irrelevant to the issue of her baby's placement. Tisha claimed that in response, she was told "countless times" that if she did not cooperate, she would not get her child back. Catherine testified that someone at the intake conference told her "if they saw some cooperation, they would consider giving the baby back [to Tisha]." Tisha testified that she was told she had to give a statement to the police before the March 15 hearing to determine the baby's permanent placement.

¶ 6.  Tisha further testified that although she was never directly told "to give Samuel up, get him in trouble," she was indirectly told to do so. Tisha stated that she thought she was not given temporary custody of her baby at the conclusion of the intake conference precisely because she refused to tell the authorities what they wanted to hear. But after discussing the situation with her father, Tisha decided that she would "say whatever they deemed worthy . . . what they

760

thought happened, or just whatever they wanted" in order to get her child back.

¶ 7. Tisha then testified that as instructed, she made an appointment to speak with the police officer the next day, March 13. At this conference, in which the social worker was also in attendance, Tisha told the officer that she had sex with Samuel in Wisconsin before she was sixteen. Tisha went on to testify, however, that she and Samuel actually did not have sex for the first time until April 1996 when they were no longer in Wisconsin. She told the court that she was coerced into making a false statement because she thought that this is what she needed to do to get her baby back.

¶ 8. Peter also testified at the motion to suppress hearing. He said that he spoke to the social worker after the intake hearing. The social worker told him that the police needed to know where and when Tisha and Samuel had sex. He testified that he conveyed this information to Tisha. Peter acknowledged that, during the intake conference itself, he did not hear any direct threats made by the authorities if Tisha did not cooperate. The social worker also testified and denied telling Peter that the police needed to know where and when Tisha and Samuel had sex.

¶ 9. After hearing the evidence, the trial court declined to decide whether Tisha's statement had been coerced. Instead, the trial court ruled that Samuel had no standing to raise the issue. The trial court reasoned that the exclusionary rule allowing for suppression of involuntary statements before trial is a prophylactic rule designed to deter Fifth Amendment concerns where it has been alleged that the defendant has personally been a victim of illegal government activity. Since it was not the defendant's statement that was

761

allegedly coerced, the trial court concluded that Samuel could not assert the constitutional rights of others. The trial court further reasoned that when a witness claims that a prior statement was the result of coercion by the police, it is up to the jury or finder of fact in each individual case to decide whether the witness's claim is credible.

¶ 10. At trial, the State called Tisha to the witness stand in its case-in-chief. After Tisha denied that she and Samuel had sex in Wisconsin while she was fifteen years old, the State submitted into evidence her prior statement. When asked about the statement, Tisha denied that it was true and claimed that it was coerced. Samuel called a number of witnesses who testified regarding the circumstances of the allegedly coerced statement. The jury found Samuel guilty, inter alia, of second-degree sexual assault, which includes sexual intercourse with a minor under the age of sixteen. Samuel then appealed and made the trial court's ruling on the motion to suppress one of the issues in his appeal.

¶ 11. In his brief to this court, Samuel claimed that the trial court had given too narrow an interpretation of the Fifth Amendment. He agreed that individuals who are not personally the victims of illegal government activity generally cannot assert the constitutional rights of others. However, he argued that a violation of another's rights may rise to the level of a violation of a defendant's rights to a fair trial when the government seeks a conviction through the use of evidence obtained by coercion. Thus, a defendant has standing to assert a Fifth Amendment right to due process as a valid objection to the introduction of statements extracted from a nondefendant by coercion or other inquisitional tactics. The issue, he maintained, is

whether the government's investigatory methods would result in a fundamentally unfair trial. He argued that such motions are also viable under the Fourteenth Amendment's Due Process Clause. He maintained that he has standing to raise Tisha's claim of having given a coerced statement because, as a matter of the truth-finding process of American jurisprudence, all coerced statements are inherently unreliable. This is so whether the statements are extracted from a defendant or whether they come from the mouth of a witness. He contended that the duty of the court is to keep out of evidence all statements obtained by illegal means so as to avoid infecting the process which, he maintained, is particularly a Fourteenth Amendment concern.

¶ 12.  In its response brief, the State asserted that standing was "questionable," but maintained that we did not have to reach the issue because, here, it was clear that Tisha's statement was not coerced. The State pointed out that nowhere is there any direct evidence that the police or its agents told Tisha she would not get her baby unless she gave a statement saying that Samuel had sex with her in Wisconsin when she was fifteen. The State argued that Tisha's "beliefs" as to what she needed to do to get her baby back were conclusions that she alone drew. Finally, the State argued that even if we did not accept the State's view of the facts, since the Fourteenth Amendment speaks to due process, Samuel's due process was not denied to him because he had the opportunity to bring out the circumstances surrounding Tisha's statement to the jury.

¶ 13.  We heard oral argument on the issue. At oral argument, Samuel maintained the same position that he had in his brief. The State's position shifted ever so slightly. Whereas, before, the State maintained

763

that standing was "questionable," it now conceded that Samuel had standing to raise the issue as a Fourteenth Amendment concern and that it could be heard under the rubric of prophylactic suppression of evidence before trial. However, the concession was based on one condition—a major one. Only if the statement was the product of "torture or extreme coercion" was a prophylactic remedy indicated. In cases where there was perhaps evidence of some lesser degree of coercion, however, the State continued to maintain that a defendant had no standing to raise the issue as a "suppression" motion. Rather, much like the trial court had ruled, if the witness complained that the statement made was untruthful because it had been coerced, the jury or the fact finder had the responsibility of determining the truth. So, in this case, where Tisha's complaint of coercion could not be considered to be the product of "torture" or "extreme" coercion, Samuel could make it an issue, but he had to make it an issue with the jury. Since Samuel did make it an issue with the jury and the jury still found him guilty of second-degree sexual assault, his claim had to fail.

¶ 14.   This is an issue of first impression in Wisconsin, but not in other jurisdictions. We begin our discussion with the approach adopted by the Tenth Circuit. In two cases, *Clanton v. Cooper*, 129 F.3d 1147, 1157–58 (10th Cir. 1997), and *United States v. Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999), the judges of that circuit laid down the rule in its jurisdiction. The courts first observed that the issue was not whether the defendant's Fifth Amendment rights had been violated. *See Gonzales*, 164 F.3d at 1289. They wrote that, obviously, the manner in which the statement was obtained does no violence to the defendant, but to the witness. *See id.* Therefore, the courts reasoned that it

was not the manner in which the statement was obtained that was at issue. *See id.* Rather, it was the fact that the State was actually going to *use* the allegedly coerced statement in a trial that was at issue. *See id.* The judges of the Tenth Circuit reasoned that if it is true that coerced statements are inherently unreliable, as the law has so found, then it was a violation of due process for the State to be using inherently unreliable evidence to make its case. *See Clanton,* 129 F.3d at 1157–58. In the view of the Tenth Circuit, the issue at stake was the integrity of our judicial system. *See id.* The judges thought that integrity would be undermined if the State were allowed to build its case against a defendant using evidence obtained through illegal police methods. *See id.*

¶ 15.   Connecting the use of illegal police methods to the Fourteenth Amendment is not a new proposition. As far back as *Jackson v. Denno,* 378 U.S. 368, 385–86 (1963), the United States Supreme Court wrote:

> It is now inescapably clear that the *Fourteenth Amendment* forbids the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will" . . . and because of the "deep-rooted feeling that the police must obey the law while enforcing the law . . . ."

*Id.* (citations omitted) (emphasis added).

¶ 16.   Of course, the *Jackson* case involved a defendant's allegedly coerced confession, not a witness's allegedly coerced statement. But *Jackson*

nonetheless demonstrates that the Fourteenth Amendment is a consideration in deciding whether to employ the prophylactic rule of suppression as a remedy for police conduct which crosses the line. *See id.* The Tenth Circuit judges so noted. *See Clanton*, 129 F.3d at 1157–58.

¶ 17. Having decided that the Fourteenth Amendment forbids the use of coerced confessions, the next step for the Tenth Circuit judges was to decide whether the Fourteenth Amendment also forbids the use of coerced statements of witnesses. The *Clanton* court wrote that a coerced witness's statement is just as unreliable as a coerced defendant's statement. *See id.* at 1158. Moreover, the government's use of coerced statements to make its case is just as antithetical to our notions of decency and fair play when it is a witness's statement as when it is a defendant's statement. In either case, use of the statement infects the integrity of the judicial system. The *Clanton* court stated that "methods offensive when used against an accused do not magically become any less so when exerted against a witness." *Id.* (citation omitted).

¶ 18. Thus far, we doubt that the State would argue with any part of the Tenth Circuit's rationale we have recited. Indeed, as we have stated above, the State concedes that the defendant has a Fourteenth Amendment due process right to ask that a witness's statement be suppressed as a prophylactic measure on grounds that it was coerced. And other federal circuits agree.

¶ 19. But, as we have previously stated, the State departs from the Tenth Circuit in one crucial aspect. The State contends that the right to a prophylactic remedy when a nondefendant witness is involved exists only if the coercion used was "torture" or was

otherwise "extreme." The State seems to assert that there is a different standard for coercion when a nondefendant is involved than with a defendant. The State relies on these jurisdictions. *See United States v. Merkt*, 764 F.2d 266, 273–75 (5th Cir. 1985) (A defendant has standing to object to the admission of a coerced witness's statement, but suppression is not appropriate as a prophylactic measure where the coercion is not so egregious.); *United States v. Chiavola*, 744 F.2d 1271, 1273 (7th Cir. 1984) (Due process is implicated when the government seeks a conviction through the use of evidence obtained by extreme coercion or torture.); *Bradford v. Johnson*, 354 F. Supp. 1331 (E.D. Mich. 1972) (Under normal circumstances, credibility is an issue a jury can determine; however, the Fourteenth Amendment is violated when a witness's confession obtained by torture is admitted against the defendant.), *aff'd*, 476 F.2d 66 (Mich. Ct. App. 1973).

¶ 20. We respectfully disagree with those courts. Our response to those courts is exactly like the response of the *Gonzales* court. We quote it in full:

> We reject the government's argument that a nondefendant witness' statement that incriminates a defendant is subject to suppression only if the statement was the product of torture or extreme coercion beyond the level of coercion required for suppression of a defendant's own confession. As we noted in *Clanton*, "methods offensive when used against an accused do not magically become any less so when exerted against a witness. . . ." Consequently, the standard for determining whether a statement was voluntary is the same whether we are dealing with a defendant or a third party witness.

*Gonzales*, 164 F.3d at 1289 n.1 (citation omitted).

¶ 21. Thus, we hold that the standard for determining whether a nondefendant witness's statement was voluntary is the same test that we use when determining whether a defendant's statement is voluntary. That test is spelled out in *State v. Clappes*, 136 Wis. 2d 222, 401 N.W.2d 759 (1987). There, the court wrote about the factors which must be considered. We recite them here.

> The relevant personal characteristics of the confessor include his age, his education and intelligence, his physical and emotional condition, and his prior experience with the police. These factors must be balanced against the police pressures and tactics which have been used to induce the admission, such as the length of the interrogation, any delay in arraignment, the general conditions under which the confessions took place, any excessive physical or psychological pressure brought to bear on the declarant, any inducements, threats, methods or strategies utilized by the police to compel a response, and whether the individual was informed of his right to counsel and right against self-incrimination.

*Id.* at 236–37 (citations omitted).

¶ 22. We also think it is appropriate to cite *Lynumn v. Illinois*, 372 U.S. 528 (1963). In that case, an oral confession was made by the defendant only after police told her that state aid would be cut off and her children would be taken from her unless she confessed. *See id.* at 533. The United States Supreme Court held that this was a coerced statement in violation of due process. *See id.* at 537. We also cite *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981). There, the court wrote:

We think it clear that the purpose and objective of the interrogation was to cause Tingle to fear that, if she failed to cooperate, she would not see her young child for a long time. We think it equally clear that such would be the conclusion which Tingle could reasonably be expected to draw from the agent's use of this technique. The relationship between parent and child embodies a primordial and fundamental value of our society. When law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit "cooperation" they exert the "improper influence" proscribed by *Malloy*.

*Tingle*, 658 F.2d at 1336.

¶ 23. We conclude that the trial court's order holding that Samuel had no standing to move to suppress Tisha's statement is in error. We reverse the order. As a consequence, we must also reverse the conviction for second-degree sexual assault. We remand this case to the trial court for a hearing to determine if Tisha's statement was voluntary. We realize there has already been an evidentiary hearing to determine this issue. And we also realize that the trial court did not make a finding at that time because of its decision regarding standing. An easy course of action would be to remand with directions that the trial court review the record and make findings of fact based on the cold record. But we will not order that. The trial judge who originally heard the motion is now retired and a new judge must be afforded the opportunity to hear and see the witnesses and judge their demeanor and credibility. We therefore remand with directions that there be a new fact-finding hearing to determine whether Tisha's statement was voluntary.

¶ 24. The trial court shall use the same factors that are outlined in *Clappes*. Since one of those factors is any "threats, methods or strategies" used by the government to compel a response, the trial court must also be mindful of *Lynumn* and *Tingle*. The key to whether *Lynumn* and *Tingle* should be applied will be whether the trial court finds that the cooperation required of Tisha included giving a coerced statement that Samuel had sex with her in Wisconsin when she was fifteen. If the trial court so finds, then it shall order a new trial on the second-degree sexual assault charge and the statement will not be admitted at this trial. If the trial court finds that the government did not compel Tisha to inculpate Samuel in return for custody of the baby, it shall reenter the judgment of conviction for second-degree sexual assault.

¶ 25. Before we leave this particular issue, we address whether this error should also result in the reversal of Samuel's convictions for interfering with parental custody and for abduction. His claim is that the statement so tainted Tisha's credibility with the jury that the jury could very well have disbelieved her testimony relating to these other two charges as well as the sexual assault charges. We agree. We will explain why this is so in the following passages.

## INTERFERENCE WITH CUSTODY

■

¶ 26. Samuel argues that there was insufficient evidence to convict him of interfering with child custody. Evidence to support a conviction is insufficient if, considering the evidence in a light most favorable to the verdict, no reasonable jury could be convinced that the defendant was guilty beyond a reasonable doubt.

*See State v. Koller*, 87 Wis. 2d 253, 266, 274 N.W.2d 651 (1979).

■

¶ 27.  The Interfering with Custody statute explains three different ways in which a person interferes with custody of the parents: causing a child to leave, taking a child away, or withholding a child for more than twelve hours. *See* WIS. STAT. § 948.31(2). Here, Samuel was charged under the "causing a child to leave" alternative, but the instruction submitted to the jury was the "taking the child away" alternative. A conviction can only stand if the evidence at trial was sufficient to convict on the theory presented to the jury. *See State v. Wulff*, 207 Wis. 2d 143, 152, 557 N.W.2d 813 (1997). Thus, our review is limited to determining whether Samuel took Tisha away from her parent.

¶ 28.  The evidence is that Tisha was living with her mother. The mother testified that on January 29, 1996, she came home between 5:00 and 5:30 a.m., fell asleep for an hour, and then awoke at 6:30 a.m. to see if the children were up for school. The mother testified that Tisha was not in her room and several things were missing, including a blanket and a suitcase. When Tisha did not come home that evening, the mother called the police. The mother testified that she did not see Tisha again until March 1997, and that she did not give Samuel permission or consent to take Tisha from her.

¶ 29.  Tisha testified that her mother had kicked her out of the house. Tisha further testified that she and Samuel agreed that he would come and pick her up and she would leave with him, which she did. Tisha's mother denied that she kicked Tisha out of the house or told Tisha that she had been kicked out of the house.

¶ 30.   Interference with child custody requires evidence that a person either caused a child to leave, took the child away or withheld the child for more than twelve hours "without the consent of the parents." Samuel's claim at trial was that since Tisha was kicked out of the house, her leaving was not without the consent of the mother. Tisha's testimony supported that theory, but the jury—by finding Samuel guilty of interfering with child custody—obviously rejected Tisha's account in favor of the mother's. The bottom line here is that Tisha's prior inconsistent statement—the statement she claims was coerced—may have affected her credibility before the jury. The jury heard her tell one story to the police and a different story in court. If the trial court eventually rules that the prior statement was in fact coerced and is inadmissible at a future trial for sexual assault, then the interfering with child custody conviction must be reversed and a new trial ordered as well. This is because Tisha's credibility with respect to the interfering charge could well have been held in low esteem by the jury after hearing the conflict between her prior statement and her statement in court. Consequently, for this reason, the interference with child custody charge is reversed. It may be reentered if the trial court finds that the prior statement was not the product of illegal police coercion.

¶ 31.   But we still have the issue of whether the interfering with child custody conviction must be reversed because the evidence is insufficient. That is a different issue and we now address it.

¶ 32.   Samuel's argument begins with a request that we look to the complete statute relating to interference with child custody. When we do that, he believes we will see that each of the three alternatives in the statute speaks to different acts. Samuel terms

the difference as being the "moving force" at work within the three alternatives. The way Samuel sees it, the first alternative, "takes away," involves the situation in which the defendant takes a child away from his or her home or parents. The moving force under that provision, as demonstrated by the verb "takes," is the defendant.

¶ 33. The second alternative is where the defendant "causes the child to leave." Here, the child is not "taken" but leaves on her or his own accord, although the defendant contributed to the decision by persuasion or otherwise. The use of the verb "leave" demonstrates a focus on the willful act of the child.

¶ 34. According to Samuel, the jury must have found that Tisha willfully left of her own accord without the consent of her mother. Samuel is bound by that finding. Nonetheless, Samuel contends that the important point here is that it was Tisha's voluntary decision to leave. Therefore, she was not "taken" by Samuel. Samuel may have "contributed" to her decision to leave, but the "cause to leave" alternative was not given to the jury. Samuel belittles the State's argument that the "takes away" theory requires only that she was physically present in the home when Samuel arrived and took her. In Samuel's view, Tisha had already left the home the minute she was out the door. Therefore, Tisha had already severed herself from the custody of her mother independent of any action by Samuel. Her driving off with Samuel occurred after she independently severed custody from her mother. Therefore, Samuel was not involved in any "taking away" from custody.

¶ 35. We do not buy Samuel's argument. What Samuel is really asking us to do is to hold that Tisha's objective act in physically and mentally closing the

door to her home defines the point at which custody was actually severed. His statutory construction analysis puts an element into the "takes away" alternative that does not exist—that a person may be guilty of taking away a child only if the child has not willfully decided to leave. We will not add words to the statute that are not there.

¶ 36.  It makes more sense to construe the statute in the manner suggested by the State. That analysis is as follows: The term "takes away" is not a technical term. The word "take" is defined as "remove." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2330 (1993). "Away" is defined as "from one's possession." *Id.* at 152. In the context of WIS. STAT. § 948.31(2), which uses the phrase "takes a child away . . . from the child's parents," the "takes away" refers to the defendant removing the child from the parents' possession. "Takes away" or removes from one's possession suggests some sort of "physical manipulation" or "physical removal" of the child from the parents.

¶ 37.  The "cause to leave" alternative also involves nontechnical words. "Cause" is defined as "brings about an effect or . . . produces or calls forth a resultant action or state." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 356 (1993). "Leave" is defined as "desert," "abandon" and "go away or depart from." *Id.* at 1287. Thus, "causing a child to leave" his or her parents means being responsible for or to bring about a child abandoning, departing or going away from his or her parents. "Causes to leave" suggests some sort of mental manipulation of the child, as opposed to physical manipulation. A defendant causes a child to leave his or her parents by doing things to persuade the child to leave. For example, if a defendant lives in California, meets a girl over the internet and encourages her to

come to California so she can become a model, and if the girl does go to California because of the defendant's persuasion, the defendant has caused her to leave her parents.

¶ 38.  We adopt the State's construction. So long as the defendant has had a hand in physically removing the child from the parents' possession, the defendant has taken the child away. This physical removal can be accomplished by driving the child away in a vehicle. The act of asportation means more than just shutting the door behind you. Driving away in a vehicle is part of the continuous act of physical removal. Samuel was directly involved in facilitating Tisha's physical removal by driving her away from the house and from the area. The evidence is sufficient.

## ABDUCTION

¶ 39.  Samuel also contends that the evidence was insufficient for the jury to convict him of abduction pursuant to WIS. STAT. § 948.30(1)(a). The statute reads that any person who, for any unlawful purpose, "takes a child who is not his or her own by birth or adoption from the child's home or the custody of his or her parent" is guilty of abduction. Samuel makes the same argument with respect to this statute that he made regarding the interference with child custody statute. He says that he did not physically take Tisha from her mother; Tisha left of her own accord or was thrown out. Under either scenario, the physical custody was at an end by the time Samuel became involved. For the same reasons that we rejected Samuel's argument relating to the interference conviction, we reject this one. Samuel was directly involved in Tisha leaving her mother's

home and was directly involved in facilitating the removal by physically driving her away from the house and the area. As a result, Samuel removed Tisha from her mother's control, and therefore, took Tisha from her mother's custody. The evidence is sufficient to sustain a conviction for abduction.

¶ 40.  However, for the same reasons that we are constrained to reverse for the moment, the interference with child custody conviction, we must also reverse and remand this abduction conviction. Samuel's defense at trial was that he could not have abducted Tisha from the mother's custody if the mother had already voluntarily relinquished custody. As we pointed out before, while Tisha claimed she was kicked out, the mother claimed that Tisha left without consent. The jury obviously believed the mother. It could be that the jury's assessment of Tisha's credibility relating to the abduction charge was affected by the admission of Tisha's prior inconsistent statement implicating Samuel in having had sex with her in Wisconsin when she was fifteen. Thus, whether the abduction conviction is reentered will depend upon the trial court's factual findings on remand.

## CLAIM OF DENIAL OF DUE PROCESS AT SENTENCING

¶ 41.  Finally, Samuel contends that he was denied due process at sentencing because the court considered psychological evidence contained in a sealed document for the CHIPS proceeding concerning Tisha. He complains that he was not a party to the proceeding, had no access to the report and therefore had no way to rebut it. He contends that the report prejudiced him at sentencing because the court commented on how Samuel's actions had resulted in Tisha

requiring long-term counseling and perhaps treatment in the future. The State argues waiver and Samuel responds that waiver is inappropriate because he had no idea that the evidence was germane to the sentencing until the trial court began its remarks while imposing sentence. He also argues that because the State did not argue waiver at the postconviction stage, it is prohibited from raising it now.

¶ 42. We accept the State's waiver argument. First, just because the trial court was in its "imposing sentence" phase, that did not prevent Samuel from objecting. He had as much right to object then as at any other time during the proceeding. Second, while we acknowledge that there are times when we will reject the State's waiver argument if it was not made at the postconviction stage, there is no iron-clad rule. A waiver analysis depends, in part, not on whether an issue was raised at the postconviction stage, but on whether the trial court could have taken some type of preventive action had the issue been timely raised. We agree with the State that had the issue been timely raised before the sentencing court, a solution could likely have been arrived at.

¶ 43. A waiver assessment also depends upon whether we should reach an issue because it is important to the integrity of the result. Here, we are convinced that the issue Samuel raises is of little consequence. As the State points out, evidence of how Tisha's experience has affected her was not really "secret" evidence. The trial court told Samuel that the report said Tisha had counseling needs and showed disrespect for authority. This was not news to Samuel. He already had ample evidence of Tisha's disrespect for authority. Had Samuel disagreed with the assessment that Tisha needed counseling because of this, he could easily have

voiced his disagreement when the trial court referred to it. The issue is waived.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.